963 F.2d 585
 60 USLW 2778
 UNITED STATES of America, Appellant No. 92-5105,
v.
Paulo SANTTINI, a/k/a Carlos Garcia, Gonzalo Higera Pena,
Harold Holquin, Jaime Arenas.
UNITED STATES of America, Petitioner No. 92-5106,
v.
Paulo SANTTINI, Gonzalo Higera Pena, Harold Holquin, Jaime
Arenas, Respondents,
The Honorable Dickinson R. Debevoise, Nominal Respondent.
 Nos. 92-5105, 92-5106.
 United States Court of Appeals,
Third Circuit.
 Argued March 11, 1992.
Decided May 8, 1992.
 
 Michael Chertoff, U.S. Atty., R. David Walk, Jr. (argued), Newark, N.J., for appellant-petitioner.
 Chester Keller (argued), Asst. Federal Public Defender, Newark, N.J., for appellee-respondent Pena.
 Howard Brownstein, Union City, N.J., for appellee-respondent Arenas.
 Laurie M. Fierro, Van de Castle & Fierro, P.C., West Orange, N.J., for appellee-respondent Holquin.
 Before: BECKER, HUTCHINSON and COWEN, Circuit Judges.
 OPINION OF THE COURT
 COWEN, Circuit Judge.
 
 
 1
 This case involves an unusual set of facts and an apparent question of first impression in the federal judicial system: whether a federal district court has the power to order federal law enforcement agents to refrain from arresting the subject of a valid arrest warrant in order to ensure that the subject of the warrant, who is a fugitive in a foreign country, will have an opportunity to give deposition testimony exculpating other criminal defendants. Unsure whether this district court order falls within the collateral order doctrine, making it immediately appealable, the government has proceeded on alternative jurisdictional theories. These two alternatives are to appeal the district court's order or to seek the extraordinary writ of mandamus or prohibition preventing the enforcement of the order. We will grant the writ to prohibit enforcement of the order of the district court.
 
 I.
 
 2
 The fugitive who is the subject of the warrant in question is Boris Conde. Conde is an unindicted coconspirator of the defendants in this criminal matter. The government alleges that from August 1, 1991 until early October, 1991, Conde, along with defendants Gonzalo Higera Pena, Jaime Idarraga Arenas, Harold Holquin and Paulo Santtini,[1] was involved in a conspiracy to manufacture, distribute, and possess with intent to distribute, cocaine. Specifically, the conspirators allegedly helped to move various precursor chemicals and equipment from Florida, through New Jersey, to Pleasant Valley, New York, where they set up a cocaine conversion laboratory.
 
 
 3
 In September, 1991, special agents of the Drug Enforcement Administration and investigators of the Somerset County Prosecutor's Office learned that Boris Conde and Martin Barrientos had driven a truck containing materials for use in the conversion laboratory from Florida to a New Jersey location. The agents conducted a consent search of the truck and discovered materials used in the cocaine conversion process. Conde agreed to cooperate with the law enforcement agents and met the following day with Pena, Arenas and Holquin. Their discussions regarding future plans to move the chemicals and other materials to New York were recorded and before the materials reached their new destination, Pena, Arenas and Holquin were arrested. The cocaine conversion laboratory in Pleasant Valley, New York was subsequently discovered by law enforcement agents.
 
 
 4
 Based on the information obtained, a federal grand jury returned a two-count indictment charging Pena, Arenas, Holquin and Santtini with (1) conspiracy to manufacture, distribute and possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1988) and (2) traveling in interstate commerce with the intent to promote unlawful activity, namely, the manufacture and distribution of cocaine, in violation of 18 U.S.C. §§ 1952 and 2 (1988). A superseding indictment embodying the same charges was returned on January 14, 1992.
 
 
 5
 Following the return of the indictment, Conde, along with his attorney, met with representatives of the federal government and was fully interviewed. He explained the details of the conspiracy and the roles of his coconspirators, and at the end of the meeting was told that a plea agreement would be sent to him within a week. Approximately one week later, in mid-November 1991, the government learned that Conde had fled from New Jersey and could not be located.
 
 
 6
 On December 6, 1991, after efforts to locate Conde proved unsuccessful, the government filed a criminal complaint against him for the crimes committed in connection with the cocaine conversion laboratory. The complaint and accompanying affidavit charged Conde with violating 21 U.S.C. § 846 and 18 U.S.C. §§ 1952 and 2. Based on the complaint and affidavit, United States Magistrate Judge Stanley R. Chesler found probable cause to believe Conde had committed the crimes charged and issued a warrant for his arrest pursuant to Fed.R.Crim.P. 4.
 
 
 7
 On December 20, 1991, after federal charges against Conde had been filed, a package containing a sworn statement by Conde was sent to the office of the United States Attorney. In the statement Conde fully exculpated all of his alleged coconspirators, contending that he alone was responsible for all criminal acts and that he had only implicated the others to gain his own freedom. This sworn statement was executed in the United States Embassy in Bogota, Colombia in the presence of Vice Consul James E. Connor, Jr. Conde's fingerprint was affixed at the end of the statement. The government forwarded copies of this statement to defense counsel.
 
 
 8
 On January 13, 1992, the government received another package. This package contained two documents, one a sworn statement by Patricia Conde, Conde's wife, and the other the sworn statement of Martin Barrientos, another coconspirator. Patricia Conde's statement, like her husband's, was sworn out at the United States Embassy in Bogota in the presence of Mr. Connor. The statement alleged that law enforcement officers held a gun to her head and threatened to take away her child unless she agreed to implicate and testify against Santtini in future criminal proceedings. Mrs. Conde explained that she had fled to Colombia because she was afraid of the government agents and would not testify against Santtini, who she alleged was innocent of any wrongdoing.
 
 
 9
 The statement by Mr. Barrientos was also sworn out at the United States Embassy in Bogota. Barrientos claimed that he had been illegally detained by government agents while in the United States and that they had threatened him and searched his apartment without authorization. In his statement he contended that government agents told him he would go to jail for many years and never see his family again unless he agreed to testify against Santtini. Finally, he stated that Santtini was "totally innocent" and in fact, Boris Conde was the only one "who is guilty and [the] leader of all of this." Supp.App. at 9. Both Conde and Barrientos deny consensual participation in the taped conversations which the government plans to use to prove the guilt of the four defendants in this case.
 
 
 10
 Based on the statements received from Boris Conde, Patricia Conde, and Barrientos, defendant Santtini made an oral application to take the deposition of Boris Conde in Colombia pursuant to Fed.R.Crim.P. 15.[2] The government opposed the motion for the following reasons: (1) counsel in civil and criminal cases are barred from conducting discovery in Colombia because the United States does not have a treaty or judicial assistance agreement with Colombia and (2) Santtini failed to carry his burden under Rule 15 to show that Conde was "unavailable" and would provide material exculpatory information. The court denied Santtini's motion on the ground that parties are prohibited from taking discovery in Colombia.
 
 
 11
 Following the court's denial of the motion, Conde's Colombian attorney informed the parties that Conde was willing to have his deposition taken in Costa Rica. The court asked counsel to appear for a hearing on this new development after being notified of the proposed alternative.
 
 
 12
 On January 31, 1992, the court considered the defendants' renewed application. Following argument, the court concluded that a prima facie showing of unavailability and materiality had been made, thereby satisfying Rule 15, but reserved decision. The government then informed the court that it would withdraw its opposition to the deposition if it was videotaped and conducted at the United States Embassy in Costa Rica.
 
 
 13
 On February 3, 1992, the court learned that Conde was willing to be deposed at the Colombian but not the United States Embassy in Costa Rica. However, the government advised the court that this proposal was unacceptable because the Colombian Embassy was considered Colombian soil and no discovery could be conducted thereon. The court asked whether Conde's appearance at the United States Embassy would subject him to the risk of arrest. The government explained that there was an extradition treaty between Costa Rica and the United States and that Conde could therefore be arrested.
 
 
 14
 Defense counsel informed the court that Conde was willing to be deposed at the United States Embassy if the court would sanction an agreement that Conde not be arrested. The government offered not to arrest Conde prior to the conclusion of the deposition but would not guarantee him complete immunity from arrest once the deposition had been concluded. The court noted the likelihood that Conde was simply trying to sabotage the trial and help his friends, rather than establish truth but concluded that it must "make any reasonable arrangements ... to have his testimony taken." App. at 28. The court, in response to the government's opposition, stated:
 
 
 15
 As a practical matter, he's not going to turn up anymore there than he would if he thinks you're going to arrest him and bring him back here and try him.... You're no worse off than you are now. The only difference would be that he comes there, gives testimony.
 
 
 16
 App. at 30. Over the government's objection, the court stated that there would be "an order that the government not effect or seek to have the Costa Rican authorities effect [Conde's] arrest while he's in Costa Rica for the purpose of having his deposition taken." Id. On February 11, 1992, the court granted the defendants' joint motion to take the deposition and ordered the government not to "effect the arrest of Boris Conde while he is in Costa Rica for the deposition." App. at 46.
 
 
 17
 The government then filed a motion for reconsideration of that order contending that the district court had no authority to suspend the execution of a valid arrest warrant and that its order violated separation of powers principles. The district court agreed that the warrant was valid and that there was no evidence that the government was responsible for Conde's flight or sought to arrest him to prevent the deposition from being taken. Nevertheless, the court concluded that "the interests of a full and complete availability of evidence which the defense requires, which is material to their case, outweighs the interests of the government which is minimal in effecting his arrest in Costa Rica." App. at 65. The court denied the request to modify its order. The government then filed a notice of appeal and sought a stay of the district court's order until this court resolved the case either by appeal or by issuance of a writ of prohibition. The stay was granted and this appeal and petition for a writ followed.
 
 II.
 
 18
 Before addressing the substantive issues raised in this case, we must determine whether we have appellate jurisdiction to consider the defendants' claim at this point in the proceedings. In short, we must decide whether this is an appropriate case in which to hear an appeal under either 28 U.S.C. § 1292(a)(1) or under the collateral order doctrine, which allows collateral orders to be appealed as final decisions under 28 U.S.C. § 1291, or whether this case warrants the extraordinary remedy of a writ of prohibition under 28 U.S.C. § 1651.
 
 
 19
 We note initially that the government has proceeded in this case on alternative jurisdictional theories. It is well-established that a writ of prohibition may not be used as a substitute for review by appeal. Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943). A court of appeals may not "engage in extraordinary review by mandamus 'in aid of [its] jurisdictio[n],' 28 U.S.C. § 1651, when it can exercise the same review by a contemporaneous ordinary appeal." Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 8 n. 6, 103 S.Ct. 927, 933 n. 6, 74 L.Ed.2d 765 (1983). However, the parties are free to proceed alternatively on application for a writ or by appeal, with the court determining which, if any, procedure is more appropriate. See Union Carbide Corp. v. United States Cutting Serv., Inc., 782 F.2d 710, 712-13 (7th Cir.1986) (proceedings seeking review by way of appeal or petition for mandamus treated as petition for mandamus on court's determination that it was the more appropriate procedure); 16 Charles A. Wright, Arthur R. Miller, Edward H. Cooper & Eugene Gressman, Federal Practice and Procedure § 3932 (1977) [hereinafter Federal Practice and Procedure ] (parties may proceed alternatively on application for a writ or by appeal, with the court determining which is the appropriate remedy). Therefore, we must first determine whether an appeal is available to the government at this time and if not, whether a writ of prohibition may issue on these facts.
 
 
 20
 A. Orders Appealable Under 28 U.S.C. § 1292(a)(1)
 
 
 21
 Section 1292(a)(1) provides that a court of appeals may exercise jurisdiction over orders granting or denying injunctions or orders that have the practical effect of granting or denying injunctions and have serious consequences. Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 108 S.Ct. 1133, 1142, 99 L.Ed.2d 296 (1988); Carson v. American Brands, Inc., 450 U.S. 79, 84, 101 S.Ct. 993, 996, 67 L.Ed.2d 59 (1981); Presinzano v. Hoffman-La Roche, Inc., 726 F.2d 105, 109 (3d Cir.1984). Even those district court orders lacking the precise label "injunction" may be appealable under section 1292(a)(1) if their effect is injunctive. See Bailey v. Systems Innovation, Inc., 852 F.2d 93, 96 (3d Cir.1988) (court of appeals not constrained by district court's characterization of its order).
 
 
 22
 While many orders are addressed to a party and direct the party to take or not take some action, not all such orders qualify as injunctions for purposes of section 1292(a)(1). Drawing the distinction is often difficult. See 16 Federal Practice and Procedure § 3922 ("An affirmative definition is harder to achieve than a list of exclusions."). If merely ordering action or inaction were sufficient to constitute an "injunction" within the meaning of section 1292(a)(1), every discovery order, for instance, would qualify for immediate interlocutory appeal under the statute. Hinton v. Department of Justice, 844 F.2d 126, 130 (3d Cir.1988). To actually fall within the scope of section 1292(a)(1) and be deemed an "injunction," the order must be " 'directed to a party, enforceable by contempt, and designed to accord or protect some or all of the substantive relief sought by a complaint in more than preliminary fashion.' " Id. (quoting IAM Nat'l Pension Fund Benefit Plan A v. Cooper Indus., Inc., 789 F.2d 21, 24 (D.C.Cir.), cert. denied, 479 U.S. 971, 107 S.Ct. 473, 93 L.Ed.2d 417 (1986)).
 
 
 23
 Substantial uncertainty exists as to "the scope of the mandatory orders that qualify as 'injunctions,' [but] ... it can be assumed that injunctions are orders that grant or protect at least part of the permanent relief sought as an ultimate result of the action." 16 Federal Practice and Procedure § 3921 (emphasis added). The order by the district court in this case, although it forbids certain government action and thus appears to be "injunctive," is not an "injunction" within the meaning of section 1292(a)(1) because it is unrelated to the "permanent relief sought as an ultimate result" of the action, in this case the prosecution of the criminal defendants.
 
 
 24
 The cases cited by the government in support of its argument that section 1292(a)(1) jurisdiction exists here do not mandate a different result. Gulfstream, 108 S.Ct. at 1138; Bailey, 852 F.2d 93. As this court has noted, the common thread among those cases in which the court has found section 1292(a)(1) jurisdiction to be lacking is that the order in question does not grant or deny the ultimate relief sought by the claimant. Cohen v. Board of Trustees of Univ. of Medicine and Dentistry, 867 F.2d 1455, 1464 (3d Cir.1989). Thus the cases cited by the government tend to support our conclusion in that they involved situations in which an injunction was sought as the substantive relief in the underlying suit. See Gulfstream, 485 U.S. 271, 108 S.Ct. 1133 (order staying or refusing to stay action for equitable relief not appealable under section 1292(a)(1) even though it postpones or accelerates resolution of action seeking injunctive relief); Bailey, 852 F.2d 93 (complaint enumerated various civil causes of action and plaintiff moved as well for a temporary restraining order and a preliminary injunction). Here, the "injunctive relief" ordered by the district court was completely unrelated to the "relief" sought in the underlying action. For that same reason, we find no basis for exercising section 1292(a)(1) jurisdiction in this case.
 
 B. The Collateral Order Doctrine
 
 25
 Title 28 U.S.C. § 1291 (1988) permits courts of appeals to review "final" decisions of the district court. As a general matter, a party may not take an appeal under section 1291 until there has been a decision by the district court that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Van Cauwenberghe v. Biard, 486 U.S. 517, 108 S.Ct. 1945, 1949, 100 L.Ed.2d 517 (1988). However, the court of appeals may review a district court's decision under the "collateral order doctrine" established in Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).
 
 
 26
 An order is appealable under the collateral order doctrine if it satisfies three conditions: it must "conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment." Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 2548, 57 L.Ed.2d 351 (1978). The Supreme Court has explained why the circumstances under which an appeal can be taken prior to final judgment are so narrow:The finality requirement in § 1291 evinces a legislative judgment that restricting appellate review to 'final decisions' prevents the debilitating effect on judicial administration caused by piecemeal appeal disposition of what is in practical consequence, but a single controversy.
 
 
 27
 Id. at 471, 98 S.Ct. at 2459 (citation omitted). With due regard to the restrictive interpretation which has been given to the collateral order exception, we conclude that while the first and third prongs of the Cohen test are satisfied on the facts before us, our doubts as to whether the second prong is satisfied require that we refrain from hearing the government's appeal under section 1291.
 
 
 28
 The district court clearly made a conclusive determination that the government may not arrest Conde if he appears at the United States Embassy in Costa Rica to give his deposition. Moreover, following its initial order, the district court denied the government's motion for reconsideration. Therefore the disputed question has been "conclusively determined" in satisfaction of the first requirement of the collateral order doctrine.
 
 
 29
 The district court's order, if allowed to stand, would also be effectively unreviewable on appeal. The Supreme Court has stated that an order is unreviewable if it "involves an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial." Lauro Lines SRL v. Chasser, 490 U.S. 495, 109 S.Ct. 1976, 1978, 104 L.Ed.2d 548 (1989). Here the right asserted by the government is the right to execute a valid arrest warrant. If Conde were allowed to travel to Costa Rica and leave without being arrested, the legal and practical value of the government's right to execute the warrant would be destroyed. In addition, once Conde's deposition was taken he would undoubtedly return to Colombia, a country which does not have an extradition treaty with the United States, and thus the government would no longer be able to effect his arrest. Therefore, an appeal from the district court's order at some later point would be meaningless and thus the third requirement of the collateral order exception is satisfied.
 
 
 30
 However, the requirement that the order from which the appeal is taken be "completely separate from the merits of the action" is not as easily satisfied as the first and third requirements. As we noted in Praxis Properties, this prong of the Cohen test really has two parts: whether the issue is important and whether it is completely separate from the merits. Praxis Properties, Inc. v. Colonial Sav. Bank, 947 F.2d 49, 58 (3d Cir.1991).
 
 
 31
 To fulfill the importance requirement, the issue must be one that is "important in the jurisprudential sense." Id. at 56 (quoting Nemours Found. v. Manganaro Corp., New England, 878 F.2d 98, 100 (3d Cir.1989)). See also Lauro Lines, 109 S.Ct. at 1980 (Scalia, J., concurring) (the right at issue must be "sufficiently important to overcome the policies militating against interlocutory appeals"). Here the government contends that the question of whether a federal district court has the power to suspend the execution of a valid arrest warrant is an "important issue." We agree that this is a serious and unsettled question. Indeed, this is a case of first impression. Therefore we conclude that this appeal presents an issue that is "important enough in a jurisprudential sense to require an immediate interlocutory appeal." Nemours, 878 F.2d at 101.
 
 
 32
 The requirement that the important issue be "completely separate" from the merits of the case derives from the principle that there should not be piecemeal review of issues that will later merge with the final judgment and thus require the court to review the same issue twice. Praxis Properties, 947 F.2d at 56-57. In order to avoid this pitfall, we must determine whether the question presented here involves factual and legal "considerations enmeshed in the merits of the dispute." Van Cauwenberghe, 108 S.Ct. at 1952.
 
 
 33
 The government contends that the question presented on this appeal merely requires the court to "analyze the powers of a federal district court and how they are limited by Rule 4 ... and does not require the [c]ourt to analyze the evidence or the merits of this criminal prosecution." Govt. Reply Brief at 2-3. However, the mere fact that this appeal, like most appeals, presents a question of law, does not in and of itself divorce that legal question from the other factual and legal issues of the case. Indeed, many questions of law are resolved only with painstaking reference to the underlying facts of a case. See Van Cauwenberghe, 486 U.S. at 528, 108 S.Ct. at 1952 (assessing legal issue of when forum non conveniens motion should be granted requires court to scrutinize the substance of the parties' dispute to determine what proof is required); Demenus v. Tinton 35 Inc., 873 F.2d 50, 52-53 (3d Cir.1989) (ruling on motion to discharge a notice of lis pendens under New Jersey law requires court to examine merits of underlying dispute).
 
 
 34
 Here, the subject of the arrest warrant in question is a witness who claims an ability to fully exculpate the defendants in the underlying case. The district court issued its order concerning this witness's deposition based on its conclusion that his testimony was material to the defense and necessary to ensure the defendants a constitutionally fair trial. We conclude that the propriety of an order which rests on a decision that a witness is central to the defense is not one which is "completely separate" from the underlying merits of the case. While we believe the question is a close one, we note that this court has "consistently construed the collateral order doctrine narrowly rather than expansively." Demenus, 873 F.2d at 53. Therefore, we choose to err on the side of finding that the order is not "completely separate" from the merits and will dismiss the government's appeal for lack of jurisdiction under 28 U.S.C. § 1291.
 
 C. Writ of Prohibition
 
 35
 Under the All Writs Act, 28 U.S.C. § 1651 (1988), the federal courts may issue all writs "necessary and appropriate in aid of their respective jurisdiction." The remedy has been termed "a drastic one, to be invoked only in extraordinary situations." Kerr v. United States Dist. Court for N. Dist. of Ca., 426 U.S. 394, 402, 96 S.Ct. 2119, 2123, 48 L.Ed.2d 725 (1976); In re Vargas, 723 F.2d 1461, 1468 (10th Cir.1983) ("writ of prohibition is a drastic and extraordinary remedy"), cert. denied, 469 U.S. 819, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984). Thus while a simple showing of error might suffice to obtain reversal on direct appeal, issuance of a writ of mandamus or prohibition under such circumstances "would undermine the settled limitations upon the power of an appellate court to review interlocutory orders." Will v. United States, 389 U.S. 90, 98 n. 6, 88 S.Ct. 269, 275 n. 6, 19 L.Ed.2d 305 (1967); Gold v. Johns-Manville Sales Corp., 723 F.2d 1068, 1071 (3d Cir.1983); United States v. Cuthbertson, 651 F.2d 189, 193 (3d Cir.), cert. denied, 454 U.S. 1056, 102 S.Ct. 604, 70 L.Ed.2d 594 (1981).
 
 
 36
 At the outset we note that the government has styled its petition as one for a writ of mandamus rather than a writ of prohibition. The two writs are somewhat different. A writ of mandamus may seem more appropriate if the form of the order is to mandate action, and a writ of prohibition if the order is to prohibit action. In re School Asbestos Litig., 921 F.2d 1310, 1313 (3d Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1623, 113 L.Ed.2d 720 (1991). We conclude that the writ sought in this case is properly deemed a writ of prohibition rather than a writ of mandamus because the government asks that this court prohibit the district court from enforcing the order it has entered with respect to the arrest of Boris Conde.
 
 
 37
 The government's erroneous terminology does not, however, affect our resolution of this case because "modern courts have shown little concern for the technical and historical differences between the two writs." Id.; In re State of South Dakota, 692 F.2d 1158, 1160 n. 4 (8th Cir.1982); Rees v. United States Dist. Court for Cent. Dist. of Ca., 572 F.2d 700, 700 n. 1 (9th Cir.1978). A petitioner need not precisely state which writ he seeks. See In re Insurers Syndicate for Joint Underwriting, 864 F.2d 208, 209 n. 1 (1st Cir.1988); Memorial Hosp. for McHenry County v. Shadur, 664 F.2d 1058, 1059 n. 1 (7th Cir.1981); In re Halkin, 598 F.2d 176, 179 n. 1 (D.C.Cir.1979). Instead, the appropriate inquiry under the All Writs Act is whether an extraordinary remedy is available, not which. In re School Asbestos Litig., 921 F.2d at 1313; In re Jackson County, Mo., 834 F.2d 150, 151 (8th Cir.1987); Jenkins v. Weinshienk, 670 F.2d 915, 917 n. 1 (10th Cir.1982). The requirements for obtaining both writs are the same. In re Jackson County, 834 F.2d at 151 ("whether the writ seeks to prohibit action or mandate it, the same considerations apply"); In re Halkin, 598 F.2d at 179 n. 1 (grounds for issuing the writs are "virtually identical").
 
 
 38
 Traditionally, federal courts have used their power to issue writs only "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." Roche, 319 U.S. at 26, 63 S.Ct. at 941. However, courts have not confined themselves to any narrow or technical definition of the term "jurisdiction." Instead, if there has been a judicial "usurpation of power" the invocation of this extraordinary remedy will be warranted. Will, 389 U.S. at 95, 88 S.Ct. at 273.
 
 
 39
 To ensure that writs of mandamus or prohibition issue in only the most limited circumstances, the Supreme Court has required that "a party seeking issuance have no other adequate means to attain the relief he desires." Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 35, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980). In addition, the petitioner bears the "burden of showing that [the] right to issuance of the writ is 'clear and indisputable.' " Will v. Calvert Fire Ins. Co., 437 U.S. 655, 662, 98 S.Ct. 2552, 2557, 57 L.Ed.2d 504 (1978), quoting Bankers Life & Casualty Co. v. Holland, 346 U.S. 379, 384, 74 S.Ct. 145, 148, 98 L.Ed. 106 (1953); Westinghouse Electric Corp. v. Republic of the Phillipines, 951 F.2d 1414, 1423 (3d Cir.1991); Cipollone v. Liggett Group, Inc., 822 F.2d 335, 340 (3d Cir.), cert. denied, 484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987); Matter of Bankers Trust Co., 775 F.2d 545, 547 (3d Cir.1985); Vargas, 723 F.2d at 1468. The writ should issue if, absent resort to mandamus, the court would lose its ability to review the issue and is particularly appropriate when the questions involved are "unsettled and important." United States v. Christian, 660 F.2d 892, 895, 897 (3d Cir.1981). The right to a writ is "clear and indisputable" when the petitioner can show "a judicial usurpation of power or a clear abuse of discretion." Vargas, 723 F.2d at 1467. See Mallard v. United States Dist. Court for S. Dist. of Iowa, 490 U.S. 296, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989) (petitioner entitled to writ of mandamus on showing district court exceeded authority granted in 28 U.S.C. § 1915(d) by appointing petitioner as counsel in a civil case); Christian, 660 F.2d at 895-97 (mandamus appropriate means to consider refusal of district court to convene a grand jury); In re Grand Jury Proceedings (U.S. Steel-Clairton Works); 525 F.2d 151, 155 (3d Cir.1975) (noting possibility of issuance of mandamus where district court entered order staying grand jury proceedings).
 
 
 40
 We believe that the requirements for the issuance of a writ of prohibition have been met in this case. Here the government has no adequate alternative means of obtaining the requested relief. If the district court's order is allowed to stand without a writ being issued, Conde will enter and leave Costa Rica, then return to Colombia, without the government being able to exercise its right to execute the arrest warrant. As will be discussed herein, we believe the government has the right to execute a valid arrest warrant, issued after a showing of probable cause. Therefore, its right to relief is "clear and indisputable." The district court committed a clear error of law in issuing its order and may have usurped a power which, subject to certain constitutional limitations which have not been satisfied here, rests exclusively in the executive branch. Finally, the question involved in this case is both unsettled and important. Therefore, this court, in the exercise of its discretion, has the authority to issue a writ of prohibition on these facts. See Kerr, 426 U.S. at 403, 96 S.Ct. at 2124 ("issuance of the writ is in large part a matter of discretion").III.
 
 
 41
 While the district court did not conclude that the warrant for the arrest of Boris Conde was in any way defective, the court nevertheless ordered the government not to arrest Conde if and when he appeared to give his deposition at the United States Embassy in Costa Rica. The court cited no statute or case law in support of its asserted authority to so order the government. Instead, the court simply determined that the defendants' interest in obtaining Conde's testimony outweighed the government's interest in effecting Conde's arrest were he to come to Costa Rica. In spite of our belief that the district court's order was the most practical solution given the peculiar circumstances of this case, we do not believe that the balancing test the court engaged in has any basis in law. Therefore, we will issue the writ of prohibition requested by the government to prevent the district court from enforcing the order it has entered.
 
 
 42
 Rule 4 of the Federal Rules of Criminal Procedure provides:
 
 
 43
 If it appears from the complaint, or from an affidavit or affidavits filed with the complaint, that there is probable cause to believe that an offense has been committed, a warrant for the arrest of the defendant shall issue to any officer authorized by law to execute it....
 
 
 44
 (emphasis added). Rule 9 similarly provides that "[u]pon request of the attorney for the government the court shall issue a warrant for each defendant named in an information supported by a showing of probable cause under oath as is required by Rule 4(a), or in an indictment." Fed.R.Crim.P. 9(a) (emphasis added). The language of these rules is mandatory, leaving the court with no discretion to refuse to issue an arrest warrant once probable cause for its issuance has been shown. See In re Sturman, 604 F.Supp. 278, 279 (N.D.Ohio 1984) (once government attorney requests arrest warrant for defendants named in a valid indictment, court must issue warrant); 8 James W. Moore, Moore's Federal Practice, p 4.02 (1989) (Rule 4 provides that if there is probable cause to believe the defendant has committed a crime, magistrate "must issue" warrant); Id. at p 9.03 (when government attorney requests arrest warrant for individuals named in an indictment, court "must issue" arrest warrant).[3]
 
 
 45
 As a general proposition, matters of law "enforcement" are within the power of the executive branch. See United States v. Russell, 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973) ("execution of the federal laws under our Constitution is confided primarily to the Executive Branch of the Government"). However, the power of the executive branch is not completely unfettered. Fed.R.Crim.P. 4, which requires that the executive branch make a showing of probable cause to the judicial branch in order to obtain a warrant, reflects, in some sense, the different functions served by the judicial and executive branches.
 
 
 46
 Courts have long held that the existence of probable cause sufficient to justify issuance of a warrant must be determined by a neutral and detached judicial officer. Steagald v. United States, 451 U.S. 204, 212, 101 S.Ct. 1642, 1647, 68 L.Ed.2d 38 (1981); Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 326, 99 S.Ct. 2319, 2324, 60 L.Ed.2d 920 (1979). The purpose of this requirement, which is embodied in Rule 4, is to "place a checkpoint between the Government and the citizen" who is the subject of suspicion. Steagald, 451 U.S. at 212, 101 S.Ct. at 1648. This "checkpoint" is an acknowledgement that " 'an officer engaged in the often competitive enterprise of ferreting out crime' may lack sufficient objectivity to weigh correctly the strength of the evidence supporting the contemplated action against the individual's interests in protecting his own liberty and the privacy of his home." Id. (citation omitted). The warrant requirement serves to "subject the probable-cause determination of the police to judicial review." Id. at 212-213, 101 S.Ct. at 1648. Thus the process of obtaining a warrant involves the very principles of checks and balances on which our system of government, with its three coequal branches, is based. Once this judicial "check" on law enforcement has taken place, however, the judicial branch seemingly has no further authority to affect the "powers" of law enforcement officials who are members of the executive branch.
 
 
 47
 In Ex Parte United States, 287 U.S. 241, 53 S.Ct. 129, 77 L.Ed. 283 (1932), the Supreme Court addressed an issue similar to the issue presented on the facts before us. There the issue was whether a district court could exercise its discretion and decide not to issue an arrest warrant once probable cause had been shown. In that case, a federal grand jury had indicted the defendant and on the basis of that indictment, the United States attorney asked the court to issue a bench warrant. Id. at 245, 53 S.Ct. at 129. The district court refused to issue the warrant, relying on its belief that issuing the warrant was a matter within its discretion. The Supreme Court held that a federal district court cannot refuse to issue an arrest warrant once probable cause for its issuance has been shown. Id. at 250, 53 S.Ct. at 131. The Court then granted the government's request for a writ of mandamus, ordering the district court to issue the warrant. The Court noted that once the grand jury had found probable cause to indict, "the court should have issued the warrant as a matter of course." Id. at 249, 53 S.Ct. at 131. The Court cautioned that refusal to issue the warrant "falls little short of a refusal to permit enforcement of the law" and interfered with the "absolute right of the United States to prosecute." Id. at 250-51, 53 S.Ct. at 132.
 
 
 48
 Given Ex Parte United States, it is clear that a federal district court is required by Rule 4--and by the limitations on its own authority--to issue a warrant once probable cause is found.[4] See also n. 3 supra (specifying the limited circumstances in which the court may void an unexecuted warrant). The refusal to issue a warrant is thus beyond the power of a federal district court. In essence, then, we read Rule 4 against the background of the principle of separation of powers.
 
 
 49
 While the power of the executive branch to fulfill its law enforcement duties is broad, it is, consistent with the foregoing reading of Rule 4, subject to certain constitutional and statutory limitations as well as judicial rules fashioned to enforce those limitations. Russell, 411 U.S. at 435, 93 S.Ct. at 1644. The judiciary may not impose its personal and private notions of "fairness" on law enforcement officials, but does have a limited authority to affect prosecutorial actions when those actions are taken in violation of the Constitution. United States v. Lovasco, 431 U.S. 783, 790, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977); Russell, 411 U.S. at 435, 93 S.Ct. at 1644; United States v. Carrasco, 786 F.2d 1452, 1456 (9th Cir.1986) (court may not interfere with decisions properly within the prosecutorial domain unless such decisions constitute constitutional violation or prosecutorial misconduct).
 
 
 50
 As a general matter, even when actions by the prosecution appear to deprive a criminal defendant of his constitutional right to present a defense, no remedy will lie for such infringement absent a showing that the government has caused the unavailability of material evidence and has done so in bad faith. See Arizona v. Youngblood, 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988) (no denial of due process where criminal defendant fails to show bad faith on part of police in destruction of evidence); Buie v. Sullivan, 923 F.2d 10, 12 (2d Cir.1990) (arrest of eyewitness who had indicated he would exculpate defendant at trial did not violate defendant's Sixth Amendment rights because defendant was able to obtain comparable evidence by other reasonable means and no showing arrest was motivated by bad faith); United States v. Blackwell, 694 F.2d 1325, 1336 (D.C.Cir.1982) (court's warning that witness could be prosecuted for perjury, which caused witness not to testify for defense, did not violate constitution absent showing witness was threatened); United States v. Fricke, 684 F.2d 1126, 1130 (5th Cir.1982) (prosecutor's advice that witnesses were targets of grand jury investigations, causing them to invoke Fifth Amendment and refuse to testify for the defense, did not violate due process because witnesses were already targets and investigation was not result of their plans to testify for the defense), cert. denied, 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 480 (1983); United States v. Herman, 589 F.2d 1191, 1204 (3d Cir.1978) (court may order prosecutor to grant immunity if prosecutor's refusal to immunize exculpatory witness is part of intentional attempt to distort judicial fact finding process), cert. denied, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979); United States v. Morrison, 535 F.2d 223, 229 (3d Cir.1976) (where prosecutorial misconduct caused witness not to testify on defendant's behalf, defendant's right to present a defense violated). In keeping with this general rule the Supreme Court has "stressed the importance for constitutional purposes of good or bad faith on the part of the Government." Youngblood, 488 U.S. at 57, 109 S.Ct. at 337.
 
 
 51
 The foregoing principles are not diluted by this court's decision in Government of Virgin Islands v. Smith, 615 F.2d 964 (3d Cir.1980). We conclude that Smith does not mandate upholding the district court's order in this case.
 
 
 52
 In Smith, a witness whose testimony might have exculpated the defendants refused to testify pursuant to his Fifth Amendment privilege against self-incrimination. The defense requested that the witness be granted use immunity but the United States Attorney refused to give consent. Accordingly, the exculpatory evidence was never presented to the jury. Id. at 967. On appeal, the defendants claimed that the refusal of the government to grant immunity violated their due process rights. This court recognized that "under certain circumstances due process may require that the government afford use immunity for a defense witness." Id. at 968.
 
 
 53
 In explaining our decision we delineated two situations in which a district court could take a role in the determination of when immunity should be granted to a defense witness whose testimony might exculpate the defendant. First, in cases where the prosecution's decision to refuse to grant immunity is made with the deliberate intention of distorting the factfinding process, the court could order the government to provide statutory immunity to the witness.[5] Id. We stressed that this avenue of relief would be foreclosed absent some showing of "distortion" or prosecutorial misconduct. In addition, we held that even in cases where no prosecutorial misconduct was shown, courts possess the inherent power to immunize the testimony of defense witnesses if all of the following conditions are met: "immunity must be properly sought in the district court; the defense witness must be available to testify; the proffered testimony must be clearly exculpatory; the testimony must be essential; and there must be no strong governmental interests which countervail against a grant of immunity." Id. at 972.
 
 
 54
 If Smith has any application in this case, clearly only its discussion concerning judicially fashioned immunity concerns us because there has been no showing that the government's interest in arresting Boris Conde is the result of a "deliberate intention [to] distort[ ] the judicial fact finding process." Herman, 589 F.2d at 1204. Therefore, there would be no justification under Smith for the district court in this case to order the government to take action or not take action in order to ensure that a particular witness testifies for the defense.
 
 
 55
 The Smith court's discussion of judicially fashioned immunity presents a somewhat different situation in that the defendant may be able to avail himself of that "remedy" even in the absence of prosecutorial misconduct.[6] We conclude that the facts of Smith differ significantly from those of the case presently before us and that even if the discussion concerning "judicial immunity" were applicable to these facts, the requirements set forth by the court in Smith have not been satisfied here.
 
 
 56
 First, the court in Smith was cognizant of the separation of powers problems that might be perceived to result from its decision, stressing that its "judicial immunity" remedy would not infringe on the power of the executive because the court would be relying on its own authority to ensure the testimony of a defense witness rather than ordering the executive branch to take action. 615 F.2d at 969-70. Even if we agreed that this distinction adequately addressed separation of powers concerns, that same distinction cannot be made on these facts because here the district court specifically ordered the government to refrain from taking action which the government clearly possessed the power to take. Therefore, we do not think the concept of a court's inherent authority, as set forth in Smith, can be applied in this case without offending the very separation of powers principles which the Smith court sought to avoid offending.
 
 
 57
 Moreover, we conclude that even if Smith could be applied on these facts, its final requirement, that there be "no strong governmental interests which countervail against a grant of immunity," has not been satisfied here. Id. at 972.[7] The government argues, and we agree, that it has a compelling interest in arresting Conde and prosecuting him for his crimes as well as an "institutional interest in maintaining its power to arrest fugitives." Gov't Reply Brief at 15 n. 6. Although the defendants would have us hold that the interest of the government in arresting Conde and the interest of the defendants in presenting their defense must be in some way balanced, we do not read Smith as requiring us to engage in a balancing test. See United States v. Sampson, 661 F.Supp. 514, 520 (W.D.Pa.1987) (Smith does not require a court, which has identified a "strong governmental interest," to weigh that interest against the defendant's need for testimony; instead, "the existence of a strong opposing governmental interest that cannot be accommodated forbids any weighing and any judicial immunity" (citation omitted)). We conclude that where a compelling government interest exists, a court simply may not invoke its "inherent" authority to ensure that all witnesses whose testimony might exculpate the defendants testify at trial. In short, Smith is clearly distinguishable from this case both doctrinally and because there has been no showing of misconduct or bad faith on the part of the prosecution.
 
 IV.
 
 58
 In sum, we conclude that the district court lacked the authority to order the government not to execute the valid warrant issued for the arrest of Boris Conde. We will issue a writ of prohibition ordering the district court not to enforce that order.
 
 
 
 [1]
 We have adopted the spelling of Paulo Santtini's name which is set forth in this court's docket sheet
 
 
 [2]
 Fed.R.Crim.P. 15(a) provides:
 Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition.
 
 
 [3]
 Fed.R.Crim.P. 4(d)(4), which specifies how an unexecuted warrant may be cancelled, seemingly explicates the only circumstance in which a court may affect the execution of a valid arrest warrant. Rule 4(d)(4) provides that if a government attorney so requests, "any unexecuted warrant shall be returned to and cancelled by the magistrate by whom it was issued." Thus by the rule's terms, an unexecuted warrant may only be cancelled on request of the government and then only by the judicial officer who initially issued it. Here the government did not request the cancellation of the warrant and it was the district court, not the issuing magistrate judge, which attempted to affect or prevent execution of the warrant
 
 
 [4]
 See also United States v. Lovasco, 431 U.S. 783, 790, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977) (prosecutor has sole discretion as to when to file criminal charges); United States v. Batchelder, 442 U.S. 114, 123-25, 99 S.Ct. 2198, 2203-04, 60 L.Ed.2d 755 (1979) (prosecutor has sole discretion in deciding whether to file criminal charges and what charges to file); and Weatherford v. Bursey, 429 U.S. 545, 561, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977) (prosecutor has sole discretion whether to plea bargain)
 
 
 [5]
 To achieve this the court would direct the government to either obtain use immunity so that the witness would testify or suffer a judgment of acquittal. 615 F.2d at 968. We recognized that this remedy "seriously intrudes into the realm of the executive" but found such an intrusion justified where the defendant has demonstrated that the prosecution acted with "the deliberate intention of distorting the judicial fact finding process." Id. (quoting United States v. Herman, 589 F.2d 1191, 1204 (3d Cir.1978), cert. denied, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979))
 
 
 [6]
 It should be noted that Smith has subsequently been limited to its particular facts by this court. See United States v. Lowell, 649 F.2d 950, 965 (3d Cir.1981) (declining to extend further the rule announced in Smith); United States v. Sampson, 661 F.Supp. 514, 520-521 (W.D.Pa.1987) (recognizing limited application of judicial immunity theory set forth in Smith ). Moreover, other courts of appeals to consider the possibility of a court's inherent authority to immunize a witness have flatly rejected the result reached in Smith. See United States v. Capozzi, 883 F.2d 608, 614 (8th Cir.1989) ("we decline to follow Smith and reassert our doubt that the court has the power to order such a grant of judicial immunity"), cert. denied, 495 U.S. 918, 110 S.Ct. 1947, 109 L.Ed.2d 310 (1990); United States v. Pennell, 737 F.2d 521, 527 (6th Cir.1984) ("while the Third Circuit's desire to insure that criminal defendants will have every opportunity to present exculpatory evidence is admirable, the federal courts simply lack the power to effectuate that aim by immunizing witnesses"), cert. denied, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985); United States v. Hunter, 672 F.2d 815, 818 (10th Cir.1982) (rejecting Smith holding that courts have "power to independently fashion witness use immunity under the guise of due process"); United States v. Thevis, 665 F.2d 616, 639 (5th Cir.) (district court may not confer immunity on defense witness simply because that witness might provide essential exculpatory information), cert. denied, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982); United States v. Turkish, 623 F.2d 769, 777 (2d Cir.1980) ("we simply do not find in the Due Process Clause a general requirement that defense witness immunity must be ordered whenever it seems fair to grant it"), cert. denied, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981); see also In re Daley, 549 F.2d 469, 479 (7th Cir.) (holding, prior to Smith, that federal court may not prescribe immunity on its own initiative), cert. denied, 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977)
 
 
 [7]
 This requirement also seeks to accommodate separation of powers concerns in that it provides for the possibility of "judicial immunity" only when the interests of the executive branch would not be harmed by the judiciary's exercise of power