Opinion by CALLAHAN; Concurrence by Judge LUCERO; Dissent by Judge SCHROEDER.
OPINION
CALLAHAN, Circuit Judge:
Jerry Arbert Pool challenges the district court’s implementation of 18 U.S.C. § 3142(b) and (c)(1)(A), requiring him to give a DNA sample as a condition of his pre-trial release. Applying the totality of the circumstances test, we affirm the district court. We hold that where a court has determined that there is probable cause to believe that the defendant committed a felony, the government’s interest in definitively determining the defendant’s identity outweighs the defendant’s privacy interest in giving a DNA sample as a condition of pre-trial release in cases in *1215 which the government’s use of the DNA is limited to identification purposes and there is no indication that the government intends to use the information for any other purpose.
I
On January 8, 2009, Pool was charged in the Eastern District of California by indictment with possessing and receiving child pornography in violation of 18 U.S.C. §§ 2252(a)(2) and 2253. Pool was arrested and brought to court for his arraignment on January 23, 2009. Pool had no prior criminal record and he entered a plea of not guilty. The magistrate judge ordered Pool released on a $25,000 unsecured bond on the condition that he obey pre-trial conditions. Pool consented to all pre-trial conditions except that he provide a DNA sample.
The court stayed the DNA collection to allow the parties to brief the issue. Pool challenges the constitutionality of amendments to the Bail Reform Act, 18 U.S.C. § 3142(b) and (c)(1)(A), which require the provision of a DNA sample as a condition for pre-trial release.[1] This condition applies to most, if not all, federal criminal charges. See 42 U.S.C. § 14135(a)(1)(A).[2]
The government defines DNA as “a double-helix shaped nucleic acid held together by hydrogen bonds and composed of base pairings of Adenine and Thymine, and Cytosine and Guanine, which repeat along the double-helix at different regions (referred to as short-tandem-repeat loci, or STR loci).” In United States v. Kincade, 379 F.3d 813 (9th Cir.2004) (en banc), we stated:
Through the use of short tandem repeat technology (“STR”), the Bureau analyzes the presence of various alleles located at 13 markers (or loci) on DNA present in the specimen. These STR loci are each found on so-called “junk DNA” — that is, non-genic stretches of DNA not presently recognized as being *1216 responsible for trait coding — and “were purposely selected because they are not associated with any known physical or medical characteristics.” H.R.Rep. No. 106-900(1) at *27. Because there are observed group variances in the representation of various alleles at the STR loci, however, DNA profiles derived by STR may yield probabilistic evidence of the contributor’s race or sex. Future of Forensic DNA Testing 35, 39-42. Even so, DNA profiles generated by STR are highly individuated: Due to the substantial number of alleles present at each of the 13 STR loci (between 7 and 20, see Future of Forensic DNA Testing 41) and widespread variances in their representation among human beings, the chance that two randomly selected individuals will share the same profile are infinitesimal — as are the chances that a person randomly selected from the population at large will present the same DNA profile as that drawn from crime-scene evidence. See Future of Forensic DNA Testing 19-22, 39-42.
Id. at 818-19 (footnotes omitted). We further recognized, however, that “[r]eeent studies have begun to question the notion that junk DNA does not contain useful genetic programming material.” Id. at 818 n. 6.
Once collected, a DNA sample is turned over to the Director of the Federal Bureau of Investigation (“FBI”). 42 U.S.C. § 14135a(b). The FBI analyzes the DNA sample and includes the results in the Combined DNA Index System (“CODIS”), an FBI-created national database that catalogues DNA profiles from numerous sources. CODIS “allows State and local forensics laboratories to exchange and compare DNA profiles electronically in an attempt to link evidence from crime scenes for which there are no suspects to DNA samples of convicted offenders on file in the system.” H.R. Rep. 106-900(1) at 8 (2000). The Attorney General has issued regulations concerning the taking of DNA samples from arrestees. 28 CFR Part 28, 73 FR 74932, 2008 WL 5155929. The regulations allow “DNA samples generally to be collected, along with a subject’s fingerprints, as part of the identification process,” but they need not be if the collection of DNA samples “would not be warranted or feasible.”[3] 73 FR at 74934.
Pool objected to giving a DNA sample primarily on the ground that doing so violated his rights under the Fourth Amendment. He also challenged the law as unconstitutional under the Eighth Amendment, and the Due Process Clause and violative of the separation of powers doctrine.
Citing our opinion in Kincade, 379 F.3d at 839-40, the magistrate applied the “totality of the circumstances” framework to consider the constitutionality of the statute. He determined:
The judicial or grand jury finding of probable cause within a criminal proceeding is a watershed event which should be viewed differently from mere prejudicial involvement gathering of evidence. After such a judicial finding, a defendant’s liberty may be greatly restricted — even denied. As part of his pretrial release, defendant may be deprived of his very liberty; he can be subject to electronic monitoring; he may be ordered to obey a mandatory curfew. ... These conditions are almost identi *1217 cal to those conditions which can be imposed on a probationer or parolee for whom a DNA testing requirement has been found appropriate under a totality of the circumstances standard. The court finds that an up-front requirement for finding probable cause that the defendant has committed the charged felony places the issue much more closely with those cases utilizing a totality of the circumstances standard.
Applying the totality of the circumstances standard, the magistrate concluded that “the decision to impose the DNA testing requirement on pre-trial detainees or releasees seems clearly warranted, if not compelling,” because “an arrestee’s identity obviously becomes a matter of legitimate state interest,” and an arrestee “has a diminished expectation in privacy in his own identity.”
In denying Pool relief, the magistrate stressed what his holding did not encompass.
It does not authorize DNA sampling after citation or arrest for infractions or misdemeanors, as in these cases there will be no judicial finding of probable cause soon after the arrest or citation, or no grand jury finding before or after the arrest. See Fed.R.Crim.P. 7(a). It does not authorize police officials to perform DNA sampling prior to a judicial finding of probable cause which must be made within 48 hours after arrest and detention. Again, it is the finding of probable cause on criminal charges which allows the court to set release conditions similar to those of probation and parole, which is the underpinning of the court’s holding in this case.
The magistrate stayed the DNA collection pending Pool’s appeal to the district court judge. The district judge conducted a de novo review, found the magistrate’s findings and analysis to be “exhaustive, well reasoned and supported by the record,” and reiterated that “no Fourth Amendment or other Constitutional violation is caused by the universal requirement that a charged defendant undergo a ‘swab test’ or blood test when necessary, for the purposes of DNA analysis to be used solely for criminal law enforcement identification purposes.”
On July 16, 2009, the district court issued an order denying the motion to amend the release order and upholding DNA testing. Pool filed a timely notice of appeal and requested a stay of the DNA collection, which the magistrate granted.
II
Title 18 U.S.C. § 3145(c) provides for an immediate appeal from a release or detention order. The district court’s determination that the mandatory DNA collection provision of the Bail Reform Act does not violate Pool’s constitutional rights is reviewed de novo. United States v. Schales, 546 F.3d 965, 971 (9th Cir.2008) (“A challenge to the constitutionality of a federal statute is a question of law that is reviewed de novo.”).
Our review of the district court’s order starts with the recognition that “[t]he compulsory extraction of blood for DNA profiling unquestionably implicates the right to personal security embodied in the Fourth Amendment, and thus constitutes a ‘search’ within the meaning of the Constitution.” Kincade, 379 F.3d at 821 n. 15; see also Friedman v. Boucher, 580 F.3d 847, 852 (9th Cir.2009) (holding that “[tjhere is no question that the buccal swab constituted a search under the Fourth Amendment”).
Accordingly, as the statute’s compulsion of a DNA sample does not contemplate the issue of a search warrant, the provision will pass constitutional muster only if it “falls within certain established and well- *1218 defined exceptions to the warrant clause.” United States v. Brown, 563 F.3d 410, 414-15 (9th Cir.2009) (internal quotation and citation omitted). Here, the district court considered two exceptions to the warrant clause, the “special needs” test and the “totality of the circumstances” test.
A. The Special Needs Test
The use of the special needs test would be problematic. The test was developed in cases outside of the law enforcement context and the Supreme Court has been leery of applying it to criminal cases. See Ferguson v. City of Charleston, 532 U.S. 67, 84, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001). The Court’s language in Ferguson renders the government’s suggestion that “special law enforcement interests” can be distinguished from ordinary law enforcement purposes questionable at best.[4] Id.; see also Friedman, 580 F.3d at 853(noting that “[b]ecause the ‘special needs’ exception applies only to non-law enforcement purposes, and the State’s interest here is the use of data for purely law enforcement purposes, the ‘special needs’ exception is inapplicable”); and United States v. Scott, 450 F.3d 863, 870 (9th Cir.2006) (commenting that “[c]rime prevention is a quintessential general law enforcement purpose and therefore is the exact opposite of a special need”).
We need not, however, determine whether the DNA collection provision could meet the special needs test because our precedent directs us to apply the totality of the circumstances test. In United States v. Kriesel, 508 F.3d 941, 947 (9th Cir.2007), we held:
Taking our cue from Samson [v. California, 547 U.S. 843, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006) ], we reaffirm that “the touchstone of the Fourth Amendment is reasonableness,” id. at 2201 n. 4, and adopt the “general Fourth Amendment approach,” which “examin[es] the totality of the circumstances to determine whether a search is reasonable.” Id. at 2197(quoting United States v. Knights, 534 U.S. 112, 118, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001)) (internal quotation marks omitted). “Whether a search is reasonable ‘is determined by assessing, on the one hand, the degree to which it intrudes upon an individual’s privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests.’ ” Id. (quoting Knights, 534 U.S. at 118-19, 122 S.Ct. 587).
See also Kincade, 379 F.3d at 832(“We today reaffirm the continuing vitality of Rise [v. Oregon, 59 F.3d 1556 (9th Cir.1995) ] — and hold that its reliance on a totality of the circumstances analysis to uphold compulsory DNA profiling of convicted offenders both comports with the Supreme Court’s recent precedents and resolves this appeal in concert with the requirements of the Fourth Amendment.”). Accordingly, we review the mandatory DNA collection provision under the totality of the circumstances test.
B. The Totality of the Circumstances Test
The totality of the circumstances test requires the court to balance the intrusion upon the individual’s privacy with the government’s legitimate interests. In *1219 Samson, the Supreme Court stated: “[w]hether a search is reasonable ‘is determined by assessing, on the one hand, the degree to which it intrudes upon an individual’s privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.’” 547 U.S. at 848, 126 S.Ct. 2193(quoting Knights, 534 U.S. at 118-19, 122 S.Ct. 587). See also Kriesel, 508 F.3d at 952 (holding that in Samson, the Supreme Court held that the totality of the circumstances test was the proper mode for analyzing a state statute requiring DNA testing as a condition of supervised release).
However, our opinions suggest that there may be a pre-requisite to the application of this test: there must be some legitimate reason for the individual having less than the full rights of a citizen. See Kincade, 379 F.3d at 833(noting “the well-established principle that parolees and other conditional releasees are not entitled to the full panoply of rights and protections possessed by the general public”); see also Scott, 450 F.3d at 873 (“Scott had a reduced expectation of privacy because he had signed a form that, on its face, explicitly waived the warrant requirement and implicitly (through the use of the word ‘random’) waived the probable cause requirement for drug testing.”). But see Rise, 59 F.3d at 1559(“Even in the law enforcement context, the State may interfere with an individual’s Fourth Amendment interests with less than probable cause and without a warrant if the intrusion is only minimal and is justified by law enforcement purposes.”).
Here, the magistrate found that the “judicial or grand jury finding of probable cause” was the “watershed event” that distinguished Pool from the general public and allowed for the application of the totality of the circumstances test. He noted that at this point, “defendant may be deprived of his very liberty; he can be subject to electronic monitoring; he may be ordered to obey a mandatory curfew.” Certainly, the magistrate is correct that at this point the government may, through the judiciary, impose conditions on an individual that it could not otherwise impose on a citizen. Thus, the determination that there is probable cause to believe Pool committed a federal felony, allows the application of the totality of the circumstances test.[5]
Pool argues, citing Scott, that the presumption of innocence to which he is entitled precludes the application of the totality of the circumstances test. This approach, however, was rejected by the Supreme Court in Bell v. Wolfish, 441 U.S. 520, 533, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), when it stated that the presumption of innocence “has no application to the determination of the rights of a pretrial detainee during confinement before his trial has ever begun.” Indeed, in United States v. Salerno, 481 U.S. 739, 749, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), the Supreme Court indicated that with a person’s arrest the government may have grounds to limit the arrestee’s rights. The Court noted:
Even competent adults may face substantial liberty restrictions as a result of the operation of our criminal justice system. If the police suspect an individual of a crime, they may arrest and hold him until a neutral magistrate determines whether probable cause exists. Gerstein v. Pugh, 420 U.S. 103 [95 S.Ct. 854, 43 L.Ed.2d 54] (1975). Finally, respondents concede and the Court of Appeals noted that an arrestee may be incarcerated until trial if he presents a risk of *1220 flight, see Bell v. Wolfish, 441 U.S. at 534 [99 S.Ct. 1861], or a danger to witnesses.
481 U.S. at 749, 107 S.Ct. 2095. When Pool was brought before the magistrate in this case, whatever the prerequisite for the application of the totality of the circumstances test, that requirement was met. Accordingly, we turn to balancing the intrusion upon Pool’s privacy against the government’s legitimate interests.
1. The Degree of Intrusion on Pool’s Privacy
Precedent establishes that the physical intrusion required to take a DNA sample is minimal. Skinner v. Railway Labor Executives’ Ass’n., 489 U.S. 602, 625, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (“We said also that the intrusion occasioned by a blood test is not significant, since such ‘tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain.’ ”) (internal citation omitted); Kriesel, 508 F.3d at 948(“The additional privacy implications of a blood test collecting DNA, as opposed to a cheek swab or other mechanism, do not significantly alter our analysis.”).
Pool’s greater concern, however, is not with the physical intrusiveness of the DNA testing, but with the intrusive nature of the information gathered by the government. The government, however, asserts that it only seeks to determine Pool’s identification. Indeed, it is doubtful that Pool, or any other individual having been indicted by a grand jury or having been subjected to a judicial determination of probable cause, has any right to withhold his or her true identification from the government. See Kincade, 379 F.3d at 837(“the DNA profile derived from the defendant’s blood sample establishes only a record of the defendant’s identity — otherwise personal information in which the qualified offender can claim no right of privacy once lawfully convicted of a qualifying offense (indeed, once lawfully arrested and booked into state custody).”); Jones v. Murray, 962 F.2d 302, 306 (4th Cir.1992) (“when a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it”).
The government argues that by design and law, the collection of DNA is limited to individual identification. The 13 markers on the DNA which the government uses to identify the donor “were purposely selected because they are not associated with any known physical or medical characteristics.” Kincade, 379 F.3d at 818(internal quotation and citation omitted). See also Kriesel, 508 F.3d at 947. In implementing the Act, the Department of Justice stated that DNA profiles are to be used for identification purposes.[6] 73 FR at 74937-38. The statute imposes criminal and financial penalties for improper use of DNA samples, 42 U.S.C. § 14135e(c), and limits access to DNA materials, 42 U.S.C. § 14133(b)(1)(A)-(C). There are also provisions for the expungement of the DNA information if the defendant is acquitted or *1221 the felony charges are dismissed. 42 U.S.C. § 14132(d)(1)(A).
Pool and the amicus raise two objections. First, they argue that the DNA information collected could reveal much more than the person’s identification. CO-DIS may focus on the junk DNA, but the DNA sample contains all of an individual’s DNA. Pool is not comforted by the government’s assurance that it will not look at other aspects of a person’s DNA. Second, Pool posits that the government through the use of familial comparisons may suspect innocent people simply because their DNA has some strands that are similar to the defendant’s DNA. Pool and the amicus assert that these arguments help distinguish DNA from fingerprints because fingerprints only identify an individual; they contain no information as to an individual’s heritage or predilections.
Addressing Pool’s concerns in inverse order, it is not clear that familial comparisons raise a constitutional privacy issue or, if they do, whose interests are violated. The concern with familial comparisons or partial matching is that a review of CODIS may disclose an individual whose DNA does not match precisely to crime scene DNA from a perpetrator, but is close enough to create a probability that the perpetrator is a close relative to the identified individual. The familial match is not implicated: by definition the match is not perfect, so the government knows that the match is not the perpetrator. It is questionable whether the rights of the perpetrator (if ultimately identified through the use of familial comparisons) are violated. This seems somewhat analogous to a witness looking at a photograph of one person and stating that the perpetrator has a similar appearance which leads the police to show the witness photos of similar looking individuals, one of whom the witness identifies as the perpetrator. It is questionable whether the person whose photograph helped focus the inquiry, or whose familial comparison helped focus the inquiry, has suffered any invasion of his or her constitutional right to privacy.
Pool’s concerns about the government’s potential use of DNA are understandable, but several factors mitigate those concerns. First, in Kriesel and Kincade, we recognized that the DNA collection system was designed not to reveal genetic traits such as physical and medical characteristics. Kriesel, 508 F.3d at 947; Kincade, 379 F.3d at 818-19. Although there is some scientific evidence to suggest that the “junk DNA” that is the focus of CO-DIS may contain information that is not “junk,” this, at most, indicates that the government might be able to ascertain genetic traits from the 13 loci, not that it actually could do so.[7] Second, even if appellant and amicus have shown that it is physically possible for the government to extract genetic traits from the 13 loci, there is no evidence that the government could legally do so without further legislation, or that the government has any intention of doing so. As noted, 42 U.S.C. § 14133(b) limits the present use of DNA information and the government asserts that Congress has prohibited the alteration of the core loci without prior notice and explanation to Congress. See P.L. 108-405 § 203(f).
Third, the plurality opinion in Kincade considered and rejected similar concerns as to the government’s potential use of DNA information. The opinion noted:
But beyond the fact that the DNA Act itself provides protections against such misuse, our job is limited to resolving the constitutionality of the program before us, as it is designed and as it has been implemented. In our system of *1222 government, courts base decisions not on dramatic Hollywood fantasies, ... but on concretely particularized facts developed in the cauldron of the adversary process and reduced to an assessable record. If, ... and when, some future program permits the parade of horribles the DNA Act’s opponents fear — unregulated disclosure of CODIS profiles to private parties, genetic discrimination, state-sponsored eugenics, ... —we have every confidence that courts will respond appropriately.
As currently structured and implemented, however, the DNA Act’s compulsory profiling of qualified federal offenders can only be described as minimally invasive — both in terms of the bodily intrusion it occasions, and the information it lawfully produces.
379 F.3d at 837-38 (footnotes omitted) (emphasis added). Although Kincade dealt with the taking of DNA from convicted offenders, the plurality’s determination that the information produced by CODIS is minimally invasive is applicable to this case. Furthermore, Pool has not offered any evidence that might undermine our determination in Kincade.
In sum, prior judicial decisions hold that the physical invasion of a buccal swab or even a blood prick is minimal and that Pool has little or no right to hide his identity from the government. The nature of the privacy invasion, however, is more difficult to evaluate because although CO-DIS is designed only to facilitate identity, Pool raises non-frivolous concerns that the government could use the DNA materials to determine genetic traits. Nonetheless, the plurality opinion in Kincade holds that the Act is “minimally invasive both in terms of the bodily intrusion it occasions, and the information it lawfully produces.” 397 F.3d at 838. We conclude that Pool has not shown any greater intrusion on his privacy than did Kincade.[8]
2. The Government’s Interests
The government’s interests in DNA samples for law enforcement purposes are well established. It is the most accurate means of identification available.[9] Furthermore, unlike fingerprint evidence that requires that the perpetrator leave a discernable fingerprint at the scene of a crime, it is much more difficult for a perpetrator not to leave some DNA evidence at the scene of a crime. We have recognized the government’s interests as “undeniably compelling” and “monumental.” Kriesel, 508 F.3d at 949.
In Kriesel, we addressed collecting DNA samples from felons on supervised release. *1223 508 F.3d at 947-50. Here, we must evaluate the government’s interests in collecting a DNA sample after a probable cause determination rather than after a person’s conviction. Nonetheless, the government’s interests remain substantial. There is usually a lengthy period of time between an initial determination of probable cause and a person’s trial (and even more time before a conviction becomes final after an unsuccessful appeal). During this period of time, the government has an interest in determining whether the individual may be released pending trial without endangering society and ensuring that he or she complies with the conditions of his or her release. The collection of a DNA sample allows the government to ensure that the defendant did not commit some other crime and discourages a defendant from violating any condition of his or her pretrial release.[10] In sum, many of the government’s interests in collecting a DNA sample after a person’s conviction are present at this earlier stage, with the possible exception of the particular needs that arise when the government confínes an individual, but these needs are replaced by the equally legitimate concerns of knowing the identity of the person being released to the public and ascertaining and imposing conditions necessary to protect the public.
3. The Balance
If not at the time that a person is arrested, certainly once there has been a determination of probable cause to believe that an individual has committed a federal felony, the individual no longer has any “right” or legitimate expectation of keeping his or her identity from the government. Kincade, 379 F.3d at 837. In light of the government’s legitimate interests in determining the true identity of the person, the balance between those rights and the individual’s rights favors the government, at least where, as here, the purpose and the effect of requiring DNA are only to provide the government with the person’s true identity.
Here, Pool does not really challenge that identity is the primary purpose of the Act. Rather, his concerns are that despite the government’s disclaimer of other interests, the collection of DNA, by its very nature, provides the government access to intimate information concerning a person’s genetic traits. We determine that in light of our precedent, these concerns do not outweigh the government’s interests because. Pool has not shown that (1) the government could, at this time, actually use the DNA information for arguably improper purposes, (2) the government could do so without further legislation, or (3) the government has any intent to so use the information. Guided by our opinion in Kincade, we apply the totality of the circumstances balancing test, and conclude that the government’s legitimate interest in definitively identifying Pool outweighs the intrusion into his privacy.[11]
*1224 4. Our perspective is consistent with the recent decisions relied upon bu Pool
The case by ease balancing of the government’s asserted legitimate interests and the intrusion into the individual’s privacy may be seen in our opinions in Friedman, 580 F.3d 847, and Scott, 450 F.3d 863.
Friedman concerned the forcible extraction of a DNA sample by a state official from a person who was being held pending trial.[12] We held that Nevada had failed to present sufficient legitimate interests or needs to overcome the intrusion of personal privacy. The panel’s conclusion of its discussion of the totality of the circumstances approach, or what it refers to as the “reasonable” argument (580 F.3d at 856), states:
The Nevada authorities extracted the DNA from Friedman not because they suspected he had committed a crime, nor to aid in his reintegration into society, nor as a matter of his continuing supervision. Their purpose was simply to gather human tissue for a law enforcement databank, an objective that does not cleanse an otherwise unconstitutional search.
580 F.3d at 858.
Pool’s case, however, presents very different factors. First, unlike the situation in Friedman, there has been a judicial determination of probable cause to believe that Pool committed a federal felony. Second, the arguments that the opinion in Friedman noted were not made by the state in that case are made by the government in this case. Here, the government has probable cause to believe that Pool committed the crime and in determining conditions that would allow the release of Pool to the public pending trial. Third, in Friedman, Nevada proffered no statutory authority for collecting a DNA sample, but here, the Attorney General seeks to enforce the Bail Reform Act passed by Congress.[13] In sum, this case presents very different concerns both as to the individual’s legitimate expectation of privacy and the government’s legitimate interests. By definition, the totality of the circumstances standard requires that the court consider *1225 the individual facts presented in each case. The determination that the circumstances in Friedman favored the individual does not control our determination that under the totality of the circumstances standard the balance of the distinct facts in this case permits the mandatory collection of DNA as a condition for pre-trial release.
The facts before us in Scott were also very different from this case and raised distinct issues under the totality of the circumstances standard. The central issue in Scott was “whether police may conduct a search based on less than probable cause of an individual released while awaiting trial.” 450 F.3d at 864. We were troubled by the assertion that the drug test and the search of Scott’s house were valid because he had consented to them as a condition of pre-trial release, and determined that “Scott’s consent to any search is only valid if the search in question (taking the fact of consent into account) was reasonable.” 450 F.3d at 868. We concluded that Nevada had failed to show that the searches were permissible under the special needs approach, noting in passing that Scott’s privacy interest in his home was “at its zenith.” Id. at 871-72.
We also held that the search in Scott was not reasonable under the totality of the circumstances approach. Id. at 872-73. However, both the government’s legitimate interests, as well as Scott’s privacy rights were different from the interests and rights presently at bar. First, the government’s interest in Scott was not in identifying Scott. Instead, it sought to condition his pre-trial release on his consent to random drug testing and to having his home searched any time of the day or night. 450 F.3d at 865. While the government’s legitimate interest in definitively identifying a defendant is well established, Kriesel, 508 F.3d at 949, we have questioned the government’s authority to otherwise intrude on a defendant’s privacy rights.[14] In Scott, we recognized that a person’s privacy interest in his home is at a zenith and is not usually reduced by a person’s arrest or even a determination of probable cause. Id. at 871-72. Moreover, we found the government’s alleged purposes for imposing the waiver to be questionable. Id. at 870 (“We assume for purposes of our analysis that the non-law-enforcement purpose — the interest in judicial efficiency — is ‘primary’ in this case. But the connection between the object of the test (drug use) and the harm to be avoided (non-appearance in court) is tenuous.”). In addition, we noted that the “government has no concern with integrating people like Scott, who has never left the community, back into the community.” Id. at 874.
In Pool’s case, the government seeks only his definitive identification which it relates to its ability to check on his activities while on pre-trial release. Thus, while we are mindful of our holding in Scott, we remain convinced that in this case the government’s legitimate interests outweigh Pool’s legitimate expectations of privacy.
We recognize that there is language in Friedman and Scott which may appear to be inconsistent with our decision and our application of Kincade and Kriesel.[15] We *1226 have plotted a course based on the guidance provided by the Supreme Court in Wolfish, 441 U.S. at 533, 99 S.Ct. 1861, and Salerno, 481 U.S. at 749, 107 S.Ct. 2095, that respects the concerns asserted in each of our cases. This led us first to conclude that the probable cause determination by the district court allows for the application of the totality of the circumstances standard. We then compared the specific government interests and expectations of privacy in this case to those asserted in the prior eases. We conclude that where a court has determined that there is probable cause to believe that the defendant committed a felony, the government’s interest in definitively determining the defendant’s identity outweighs the defendant’s privacy interest in giving a DNA sample as a condition of pre-trial release where the government’s use of the DNA is limited to 13 loci “purposely selected because they are not associated with any known physical or medical characteristics,” at least where, as here, there is no evidence that the government may legally extract any other information from the sample or that the government has any intention of attempting to do so.
Ill
Pool also advances four other constitutional challenges to being required to give a DNA sample in order to qualify for pretrial release. He asserts that “the mandatory DNA testing and profiling condition” (1) “violates procedural due process because it eliminates an independent judicial determination as to the necessity of the condition,” (2) violates his “Eighth Amendment right to be released on conditions that are not excessive in light of his circumstances,” (3) “violates the separation of powers by depriving the court of its role in deter mining release conditions,” and (4) “is an unconstitutional extension of federal power.” We do not find any of these arguments to be persuasive.
A. Pool has not shown that requiring him to provide a DNA sample violates his rights to due process.
Pool asserts that he was denied procedural due process because the district court could not consider his specific situation in determining whether to require a DNA sample. This argument fails in light of the Supreme Court’s opinion in Connecticut Department of Public Safety v. Doe, 538 U.S. 1, 4, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003). See also Doe v. Tandeske, 361 F.3d 594, 596 (9th Cir.2004) (quoting Conn. Dep’t.). In Connecticut Department of Public Safety, the Supreme Court held that the state’s decision to require registration as a sex offender on the basis of a person’s prior conviction rather than on the basis of the person’s dangerousness did not amount to a violation of due process because “due process does not require the opportunity to prove a fact that is not material to the State’s statutory scheme.” 538 U.S. at 4, 123 S.Ct. 1160. Here, Congress’s determination to require a DNA sample as a condition of pre-trial release where the district court has made a probable cause determination similarly does not deny Pool procedural due process.
To the extent that Pool also claims a violation of substantive due process based *1227 on his fundamental “liberty interest in remaining free of compelled DNA production,” his assertions are not persuasive. As we have previously noted, at least once a probable cause determination has been made, if not before, Pool has no right to withhold his identification from the government. See Kincade, 379 F.3d at 837; see also Jones, 962 F.2d at 306 (holding that “when a suspect is arrested on probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it”). In addition, although Pool may have a right against the physical invasion occasioned by giving a DNA sample, it is firmly established that blood tests — which are considerably more invasive than a cheek swab — are commonplace and not significant invasions. Kincade, 379 F.3d at 836 (citing Skinner, 489 U.S. at 625, 109 S.Ct. 1402). In light of these precedents, we cannot find that requiring Pool to provide a DNA sample is a violation of his right to substantive due process.[16]
B. Pool has not shown that requiring him to provide a DNA sample violates his right under the Bail Clause of the Eight Amendment.
Pool argues that requiring him to provide a DNA sample as a condition for pre-trial release constitutes excessive bail under the Eighth Amendment because “DNA testing and profiling is simply not relevant to the two issues to be addressed by pretrial conditions of release: assuring the appearance of the defendant in the court case, and providing for the safety of the community.” We do not find this argument persuasive. In Salerno, the Supreme Court noted that “[t]he only arguable substantive limitation of the Bail Clause is that the Government’s proposed conditions of release or detention not be ‘excessive’ in light of the perceived evil.” 481 U.S. at 754, 107 S.Ct. 2095. Here, in light of Pool’s minimal interest against providing identification, the limited nature of the intrusion, and the potential value of the DNA identification in solving crimes and deterring the commission of future crimes, we cannot say that requiring a DNA sample is “excessive.”
C. Pool has not shown that requiring him to provide a DNA sample violates the constitutional doctrine of separation of powers.
Pool asserts, referencing United States v. Klein, 13 Wall. 128, 80 U.S. 128, 146-47, 20 L.Ed. 519 (1871), that Congress violated the separation of powers doctrine in enacting the Bail Reform Act because “it prescribes a rule for courts to follow without allowing courts to exercise independent judicial power.” More recent precedent renders Pool’s argument less than persuasive. In Chapman v. United States, 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), the Supreme Court noted that “Congress has the power to define criminal punishments without giving the courts any sentencing discretion,” and that “[a] sentencing scheme providing for individualized sentences rests not on constitutional commands, but on public policy enacted into statutes.” Id. at 467, 111 S.Ct. 1919 (internal quotations and citations omitted). Moreover, in United States v. Lujan, 504 F.3d 1003, 1007 (9th Cir.2007), we rejected a separation of powers argument challenging the collection of DNA from a convicted felon as a condition of supervised release. We do not think that the expansion of the class of persons covered by the statute changes the nature, *1228 or result, of the separation of powers analysis.
D. Pool’s argument that requiring him to provide a DNA sample is an unconstitutional extension of federal power is not well taken.
Finally, Pool attempts to argue that § 14135a is unconstitutional because it “extends broadly to all individuals who are arrested, facing charges, or convicted, without regard to whether they fall within any federal criminal jurisdiction.” Again, we do not find Pool’s assertion to be well taken. First, as Pool admits, the district court here only interpreted the statute as it applies to federal arrestees, defendants and convicts. We too limit our review to Pool’s claim as a person who has been charged with a federal felony. In United States v. Reynard, 473 F.3d 1008, 1021 (9th Cir.2007), we rejected an argument that a statute was “unconstitutional because the federal government lacks the authority under the Commerce Clause to require a federal offender to provide a DNA sample as a condition of his supervised release.”[17] Although the statute here at issue is broader than the statute before us in Reynard, our reasoning in Reynard if not binding is persuasive.
IV
In this case, we agree with the magistrate that his finding of probable cause was a “watershed event” that allows for the totality of the circumstances exception to the Fourth Amendment’s warrant requirement. We conclude that here, the government’s interest in definitively determining Pool’s identity outweighs his privacy interest in giving a DNA sample as a condition of pre-trial release in part because the government’s use of the DNA is limited to identification purposes and there is no indication that the government intends to use the information for any other purpose or may legally do so. Finally, we decline Pool’s claims that the mandatory DNA collection provision of 18 U.S.C. § 3142(b) and (c)(1)(A) is unconstitutional because it (1) violates his right to due process, (2) violates his rights under the Bail Clause of the Eighth Amendment, (3) violates the doctrine of separation of powers, and (4) is an improper extension of federal power. The district court’s order requiring Pool to give a DNA sample as a condition to pre-trial release is AFFIRMED.

. The Bail Reform Act, 18 U.S.C. § 3142(b) and (c)(1), provides:
(b) Release on personal recognizance or unsecured appearance bond. — The judicial officer shall order the pretrial release of the person on personal recognizance, or upon execution of an unsecured appearance bond in an amount specified by the court, subject to the condition that the person not commit a Federal, State, or local crime during the period of release and subject to the condition that the person cooperate in the collection of a DNA sample from the person if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000 (42 U.S.C. 14135a), unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community.
(c) Release on conditions. — (1) If the judicial officer determines that the release described in subsection (b) of this section will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community, such judicial officer shall order the pretrial release of the person—
(A) subject to the condition that the person not commit a Federal, State, or local crime during the period of release and subject to the condition that the person cooperate in the collection of a DNA sample from the person if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000 (42 U.S.C. 14135a); and
(B) subject to the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community, which may include the condition that the person—

. Section 14135a(a)(l)(A) provides that “[t]he Attorney General may, as prescribed by the Attorney General in regulation, collect DNA samples from individuals who are arrested, facing charges, or convicted or from non-United States persons who are detained under the authority of the United States.”

. The regulation notes, ”[f]or example, in relation to non-arrestees, DHS will not be required to collect DNA samples from aliens who are finger-printed in processing for lawful admission to the United States, or from aliens from whom DNA-sample collection is otherwise not feasible because of operational exigencies or resource limitations.” 73 FR at 74934.

. The Court noted:
Because law enforcement involvement always serves some broader social purpose or objective, under respondents’ view, virtually any nonconsensual suspicionless search could be immunized under the special needs doctrine by defining the search solely in terms of its ultimate, rather than immediate, purpose. Such an approach is inconsistent with the Fourth Amendment.
532 U.S. at 84, 121 S.Ct. 1281 (footnotes omitted).

. As this is what the district court held, we need not, and do not, consider what other circumstances might allow for the use of the totality of the circumstances test.

. The Department of Justice's regulation states:
the DNA profiles retained in the system are sanitized "genetic fingerprints” that can be used to identify an individual uniquely, but do not disclose an individual's traits, disorders, or dispositions. The rules governing the operation of CODIS reflect its function as a tool for law enforcement identification, and do not allow DNA information within the scope of the system to be used to derive information concerning sensitive genetic matters. See 42 U.S.C. §§ 14132(b), 14133(b)-(c), 14135e.
73 FR at 74937-38.

. There is no indication that Pool sought discovery or sought to introduce expert testimony as to the government's ability to extract genetic traits from the DNA sample.

. Although Judge Gould in his concurring opinion in Kincade expressed concern with the possible misuse of DNA information, 379 F.3d at 841-42, he appears to have agreed with the plurality that the issue was not ripe for judicial review. He posed the question of whether the DNA of a person who had “wholly cleared their debt to society” should be erased, and responds that in a proper case “where this issue is presented, we would presumably need to weigh society’s benefit from retention of the DNA records of a felon against that person’s right in a classical sense to privacy.” Id.

. See District Attorney’s Office for Third Judicial District v. Osborne, — U.S. --, 129 S.Ct. 2308, 2327, 174 L.Ed.2d 38 (2009) ("DNA tests can, in certain circumstances, establish lo a virtual certainty whether a given individual did or did not commit a particular crime.”) (internal quotations and citations omitted); see also Kaemmerling v. Lappin, 553 F.3d 669, 681 (D.C.Cir.2008) ("DNA testing is the most reliable forensic technique for identifying criminals when biological material is left at the crime scene.”) (internal quotation and citations omitted); and United States v. Sczubelek, 402 F.3d 175, 184 (3d Cir.2005) (noting that compared to fingerprints, “DNA is a further — and in fact a more reliable— means of identification”).

. In some instances, it is even possible that the collection of a DNA sample from a defendant may produce exonerating evidence.

. Our use of the totality of the circumstances test is consistent with opinions by the First, Third, Fourth, Fifth, Eighth, Eleventh and D.C. Circuits. See United States v. Weikert, 504 F.3d 1, 9 (1st Cir.2007) (applying “the general Fourth Amendment totality of the circumstances analysis to [defendant’s] challenge to the DNA Act”); United States v. Sczubelek, 402 F.3d 175, 184 (3d Cir.2005) (stating that it believes “that it is appropriate to examine the reasonableness of the taking of the sample under the more rigorous Knights totality of the circumstances test rather than the Griffin special needs exception"); Jones, 962 F.2d at 306-07 (4th Cir. 1992) (applying the totality of the circumstances framework); Groceman v. United States Dep’t of Justice, 354 F.3d 411, 413-414 (5th Cir.2004) (per curiam) (noting that “Courts may consider the totality of circumstances, including a person’s status as an inmate or probationer, in determining whether his reasonable expecta *1224 tion of privacy is outweighed by other factors”); United States v. Kraklio, 451 F.3d 922, 924-25 (8th Cir.2006) (federal DNA Act) (holding that "based on the totality of the circumstances, the collection of DNA under the DNA Act for inclusion in the CODIS database does not constitute an unreasonable search and seizure in violation of the Fourth Amendment”); Padgett v. Donald, 401 F.3d 1273, 1280 (11th Cir.2005) (stating "[u]tilizing the Knights approach, we next address whether the statute is reasonable under a totality of the circumstances analysis”); and Johnson v. Quander, 440 F.3d 489, 496 (D.C.Cir.2006) (commenting that "[tjoday we join this unanimous body of authority, and we conclude that the mandatory collection of Johnson’s DNA sample was "reasonable” under the Fourth Amendment's balancing test.” (footnote omitted)). Notably, all of these cases upheld the collections of DNA evidence before them under the specific statutes and circumstances presented.

. Our opinion in Friedman noted:
After Friedman repeatedly refused to voluntarily provide a DNA sample, Boucher forced Friedman's jaw open and forcefully took a buccal swab from the inside of Friedman’s mouth. This search was not related to the Nevada charges then-pending against Friedman. Indeed, [the deputy district attorney] later represented to a Nevada Justice Court that she had ordered the search to use Friedman's DNA in the investigation of cold cases. Friedman was not a suspect in any of the cases.
580 F.3d at 851 (footnote omitted).

. Thus, unlike the search in Friedman, here the search was requested according to "standardized criteria.” See Florida v. Wells, 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990).

. In Scott, we explained:
The "unconstitutional conditions" doctrine, cf. Dolan v. City of Tigard, 512 U.S. 374, 385, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), limits the government's ability to exact waivers of rights as a condition of benefits, even when those benefits are fully discretionary. Government is a monopoly provider of countless services, notably law enforcement, and we live in an age when government influence and control are pervasive in many aspects of our daily lives.
450 F.3d at 866 (footnote omitted).

. For example, the opinion in Friedman notes "neither the Supreme Court nor this court has ever ruled that law enforcement officers may conduct suspicion-less searches on pretrial detainees for reasons other than prison security.” 580 F.3d at 856-57. How *1226 ever, while in Friedman the state failed to show sufficient legitimate interests to outweigh Friedman’s privacy interests, here, the application of the totality of the circumstances test — as required by Kincade and Kriesel — leads to a different conclusion. The claim that neither the Supreme Court nor this court has previously reached the conclusion we do today, does not militate against our application of the totality of the circumstances test to the particular facts presented and concluding that the government's legitimate interests out-weigh Pool's privacy interests.

. The alleged intrusion on any of Pool’s rights is also reduced by the provision that the DNA sample may be expunged if he is found not guilty or his case is dismissed. See 42 U.S.C. § 14132(d)(1)(A).

. We explained:
Reynard’s argument lacks merit. The federal government’s authority to regulate the conditions of a federal offender's supervised release arises when the individual commits a federal crime. The federal government is not required to demonstrate that it has independent authority to impose each individual condition of supervised release upon an offender. Nonetheless, in this instance, the individual condition of supervised release at issue, standing alone, is a valid exercise of the federal government's authority pursuant to its Commerce Clause power. Further, such an exercise of Congress’s Commerce Clause power does not offend principles of federalism.
473 F.3d at 1021-22.