RENDELL, Circuit Judge,
with whom Circuit Judges McKEE, Chief Judge, BARRY, GREENAWAY, JR., and VANASKIE join, and AMBRO joins as to Part II only, dissenting.
I respectfully dissent because I find both of the majority’s conclusions here— that we have jurisdiction over this appeal and that the Government’s program of collecting, analyzing, and maintaining the DNA of arrestees and pretrial detainees comports with the Fourth Amendment — to be seriously flawed. As to jurisdiction, the pretrial order from which the Government appeals falls squarely outside the narrow class of orders that warrant interlocutory appeal by the Government in criminal cases. The Government’s statutory interest in collecting and analyzing Mitchell’s DNA implicated by the order is neither “important” in the jurisprudential sense required to justify such appeals, nor completely separate from the merits of Mitchell’s case.
With respect to the Fourth Amendment question, the majority gives short shrift to an arrestee’s and pretrial detainee’s expectation of privacy in his DNA, reducing it to an interest in identity only, and overstates the significance of the Government’s interest in collecting evidence to solve crimes. It reasons that limitations on the use of an arrestee’s most personal information immunizes the Government from the Fourth Amendment’s warrant requirement. But this ignores the fact that the searches and seizure of one’s DNA permitted by 42 U.S.C. § 14135(a)(1)(A) implicate privacy interests far more expansive than mere identity. In the face of such heightened privacy interests, statutory restrictions on the use of the DNA collected from suspects who have not been convicted of a crime, though not wholly irrelevant, are not panaceas. They cannot offset the severe invasion of privacy that takes place when an arrestee’s DNA is seized and searched. And the intent of the Government in using arrestees’ DNA to solve other crimes, while it may be salutary and helpful in that regard, is not compelling. When the privacy and Government interests are weighted appropriately, one can only conclude that the Government’s program of warrantless, suspicionless DNA collection from arrestees and pretrial detainees is fundamentally incompatible with the Fourth Amendment. Therefore, I respectfully dissent.
I.
A.
Our ability to review interlocutory appeals by the Government in criminal cases *417 is extraordinarily restricted. The traditional limit on interlocutory appeals — the final-judgment rule — is “ ‘at its strongest in the field of criminal law,’ ” where the accused (and society as a whole) have a strong interest in resolving criminal charges quickly. Flanagan v. United States, 465 U.S. 259, 264, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984) (quoting United States v. Hollywood Motor Car Co., 458 U.S. 263, 265, 102 S.Ct. 3081, 73 L.Ed.2d 754 (1982)). Although the collateral-order doctrine provides an exception to the final-judgment rule that may be applied in criminal cases, Carroll v. United States, 354 U.S. 394, 403, 77 S.Ct. 1332, 1 L.Ed.2d 1442 (1957), the Supreme Court requires that we “interpret ] the requirements of the collateral-order exception to the final judgment rule with the utmost strictness in criminal cases,” Flanagan, 465 U.S. at 265-66, 104 S.Ct. 1051. Heeding the Supreme Court’s mandate, the Courts of Appeals have only sparingly exercised jurisdiction over prejudgment appeals in criminal cases.[1]
Our jurisdiction is further limited in this case because the Government, not the defendant, seeks review of the District Court’s order. As the majority itself recognizes, many criminal cases holding that interlocutory review is warranted implicate the rights of the defendant. Maj. Op. 394-95. The exceptional instances where courts have exercised collateral-order jurisdiction over Government appeals in criminal cases involved substantial interests that would be lost without interlocutory review. For instance, in United States v. Whittaker, 268 F.3d 185, 192 (3d Cir.2001), we exercised interlocutory jurisdiction over a district-court order that leveled a wholesale challenge at the Government’s right to be represented by the United States Attorney in the district of the prosecution. In a similar case, United States v. Bolden, 353 F.3d 870, 875-76 (10th Cir.2003), the Tenth Circuit Court of Appeals explained that an order disqualifying the United States Attorney’s office “raises important separation of powers issues,” which “are undoubtedly jurisprudentially important,” especially because “disqualifying an entire United States Attorney’s office is almost always reversible error.”[2] But in other cases, even those implicating “substantial national security concerns,” courts have declined to exercise interlocutory review. See, e.g., United States v. Moussaoui, 333 F.3d 509, 516 (4th Cir.2003) (“Moussaoui /”) (declining to exercise interlocutory jurisdiction over Government’s appeal from a pretrial order, despite “substantial national security concerns” implicated by the order).
B.
To exercise jurisdiction under the collateral-order doctrine, we must find that the District Court’s order “conclusively determinéis] the disputed question, resolve[s] *418 an important issue completely separate from the merits of the action, and [is] effectively unreviewable on appeal from a final judgment.” Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). If the order fails to satisfy any of these requirements, it is not an appealable collateral order. We, Inc. v. City of Philadelphia, 174 F.3d 322, 324 (3d Cir.1999) (citation omitted).
Construing these requirements strictly, as we must, I cannot agree with the majority that the order in this case “resolve[s] an important issue completely separate from the merits of the action.” Coopers & Lybrand, 437 U.S. at 468, 98 S.Ct. 2454. As the majority correctly points out, this requirement contains “ ‘two sub-requirements: (a) the issue must be important; and (b) the issue must be completely separate from the merits of the action.’ ” Maj. Op. 395 (quoting United States v. Wecht, 537 F.3d 222, 230 (3d Cir.2008)). Neither is met in this case.
First, it is not enough to conclude, in the abstract, that the Government’s asserted interest is “important.” To satisfy the collateral-order rule, we must satisfy ourselves that the Government’s asserted right is “ ‘important in a jurisprudential sense,’ ” i.e., important enough to “ ‘overcome the policies militating against interlocutory appeals.’ ” Praxis Props., Inc. v. Colonial Sav. Bank, 947 F.2d 49, 56 (3d Cir.1991) (citation omitted). New issues satisfy this stringent test. Some violations of constitutional rights qualify, see, e.g., Wecht, 537 F.3d at 231 (holding order restricting “the public’s right of access to judicial proceedings” immediately appeal-able because that right “is a constitutional right of sufficient weight to permit the possibility of departing from ordinary final judgment principles” and “contemporaneous disclosure” of information pertaining to the trial would be lost if appeal were to be postponed); Abney v. United States, 431 U.S. 651, 660, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (orders denying motions to dismiss on double jeopardy grounds are immediately appealable because “the rights conferred on a criminal accused by the Double Jeopardy Clause would be significantly undermined if appellate review of double jeopardy claims were postponed until after conviction and sentence”), but others do not. Even a defendant’s right to interlocutory review is not automatic. For instance, despite the significance of the Sixth Amendment right to counsel, an order disqualifying defense counsel “lacks the critical characteristics” of jurisprudential significance to merit interlocutory review. Flanagan, 465 U.S. at 266, 104 S.Ct. 1051. Similarly, a defendant cannot obtain interlocutory review by claiming a violation of the right to a speedy trial, United States v. MacDonald, 435 U.S. 850, 857, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978), or a violation of grand jury secrecy rules, Midland Asphalt Corp. v. United States, 489 U.S. 794, 800-02, 109 S.Ct. 1494, 103 L.Ed.2d 879 (1989), notwithstanding the constitutional import of those rules.
In this case, the Government claims an interest that is of Congress’s doing, 42 U.S.C. § 14135a(a)(l)(A), and is not “of constitutional stature.” Globe Newspaper Co. v. Super. Ct. for Norfolk Cnty., 457 U.S. 596, 604, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982). Though the Government’s statutory authority to collect DNA samples from arrestees does, as the majority emphasizes, “ ‘raise[ ] questions of clear constitutional importance,’ ” Maj. Op. 395 (quoting Sell v. United States, 539 U.S. 166, 176, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003)), there is no long-standing recognition of this authority to collect DNA samples (forcibly, in some cases, see 42 U.S.C. § 14135a(a)(4)), analyze them, and retain them indefinitely. Moreover, the constitutional significance is of importance to the *419 defendant, not the Government. No constitutional right is implicated by disallowing the taking of the defendant’s DNA as occurred here.
The majority suggests that Sell v. United States, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003), supports collateral-order jurisdiction over this case because of the constitutional importance of “the Government’s interest in conducting reasonable searches for law enforcement purposes and individuals’ rights to be free from unreasonable searches.” Maj. Op. 395. But Sell was not so broad. There, the Court upheld the exercise of collateral-order jurisdiction over an appeal by the defendant from a pretrial order permitting the Government to administer medication to a criminal defendant without his permission. The dispositive issue was that, by the time a post-judgment appeal could be filed, “Sell will have undergone forced medication — the very harm that he seeks to avoid.” 539 U.S. at 176-77, 123 S.Ct. 2174. Since “involuntary medical treatment raises questions of clear constitutional importance,” interlocutory jurisdiction was appropriate. Id. at 176, 123 S.Ct. 2174.[3] In Sell, unlike here, the defendant’s rights were clearly at issue, and at risk.
Here, by contrast, even if the District Court’s order is wrong on the merits, no constitutional right will be forfeited if we do not exercise jurisdiction over the appeal. The only harm will be to the Government’s ability to take action prescribed by statute. The majority fails to recognize this in its cursory appraisal of jurisprudential importance. There is no “sever[e] ... intrusion” upon the Government here, see Sell, 539 U.S. at 177, 123 S.Ct. 2174; indeed, there is no intrusion upon the Government at all. The intrusion upon Mitchell would be of constitutional import, but the impact on the Government’s statutory prerogatives is not. It also is of minimal practical significance. If Mitchell is convicted, the Government will have the undisputed right to collect his DNA. See United States v. Sczubelek, 402 F.3d 175, 187 (3d Cir.2005). If he is acquitted, he will be entitled by law to have the Government expunge his DNA profile from its CODIS database. 42 U.S.C. § 14132(d)(l)(A)(ii).
Second, the issue here is not completely separate from the merits of the prosecution. The majority dismisses Mitchell’s concern in this regard by stating that “[njothing in the record demonstrates that Mitchell’s DNA will be an issue at trial or that the Government intends to compare Mitchell’s DNA sample to DNA evidence collected from a crime scene....” Maj. Op. 396-97. While that may be true, it ignores the fact that nothing prevents the Government from using Mitchell’s DNA against him at trial. See 42 U.S.C. § 14132(b)(2)(C) (providing that DNA samples and DNA analyses may be disclosed “in judicial proceedings”). Indeed, the Government urges the Court to uphold the Government’s right to collect a defendant’s DNA before trial precisely because such evidence may prove useful to the prosecution of the crime for which the subject was arrested: “Collection of a defendant’s DNA fingerprints at or near the time of arrest serves important purposes relating directly to the arrest and ensuing proceedings.” Gov’t Br. 40 (emphasis added); see id. at 40-41 (arguing that DNA collected before trial under § 14135a(a)(l)(A) “functions to aid the Government in” carrying its burden of *420 proof by “identifying the defendant” and providing additional information about “what that person has done”). And the majority accepts the Government’s argument in this regard, noting that the information coded in Mitchell’s DNA has “important pretrial ramifications” and that the Government needs that information “as soon as possible” because “DNA profiling assists the Government in accurate criminal investigations and prosecutions,” including in the “investigation of the crime of arrest.” Maj. Op. 414-15 (emphasis added).[4] The Government’s heightened interest in obtaining a defendant’s DNA during the window of time between his arrest and his acquittal or conviction is based, at least in part, on its desire to use that DNA to help ascertain the defendant’s identity as it relates to his guilt or innocence of the crime he is currently being charged with. Thus, I cannot agree with the majority that the question of the Government’s right to collect Mitchell’s DNA is “completely separate from the merits of the action” when a key reason for allowing the Government to collect Mitchell’s DNA is the potential for the Government to uncover information it can use in investigating and prosecuting the “crime of arrest.”
Because this appeal does not “resolve an important issue” or pertain to an issue that is “completely separate from the merits of the action,” and because we must interpret the collateral-order doctrine “with the utmost strictness” in this ease, we lack jurisdiction over the Government’s appeal. Coopers & Lybrand, 437 U.S. at 468, 98 S.Ct. 2454; Flanagan, 465 U.S. at 266, 104 S.Ct. 1051.
II.
In addressing the merits, the majority concludes that “the latest and most wide-reaching federal DNA collection act,” a statute that provides for the warrantless, suspicionless collection, analysis, and indexing of the DNA of federal arrestees and pretrial detainees — individuals who have not been convicted of a crime — does not present a Fourth Amendment problem. Maj. Op. 397-98. I disagree. The majority’s holding means that if a person is arrested for a federal crime in a case of mistaken identity (an all-too-common occurrence), the Government has the automatic right to sample the arrestee’s DNA, to analyze it, and to include a profile derived from the DNA sample in CODIS. See 42 U.S.C. § 14135a(a)(l)(A), (b). Under the majority’s holding, the arrestee has no way to protest or to prevent the Government from taking his DNA; his only recourse is to wait and later provide the Government with a “certified copy of a final court order establishing that” the charges against him have “been dismissed or [have] resulted in an acquittal,” or that “no charge was filed within the applicable time period.” Id. § 14132(d)(l)(A)(ii). Even then, although his DNA profile will be expunged from CODIS, the Government will retain his DNA sample indefi *421 nitely. I simply cannot imagine that our Government can so easily override a person’s expectation of privacy in his DNA.
The privacy interests of arrestees, while diminished in certain, very circumscribed situations, are not so weak as to permit the Government to intrude into their bodies and extract the highly sensitive information coded in their genes. Moreover, the Government’s asserted interest in this case — the law enforcement objective of obtaining evidence to assist in the prosecution of past and future crimes — presents precisely the potential for abuse the Fourth Amendment was designed to guard against. Thus, arrestees’ and pretrial detainees’ privacy interests in their DNA are stronger, and the Government’s interest in evidence collection for crime-solving purposes is less compelling, than the majority represents. After distinguishing our holding in United States v. Sczubelek, 402 F.3d 175 (3d Cir.2005), I will address these interests in turn.
A.
Sczubelek, which might appear to control this case, is readily distinguishable. There, we held that the collection and analysis of DNA samples from individuals convicted of certain qualified federal offenses do not violate the Fourth Amendment. Id. at 187. Thus, the key question in this case is whether Mitchell’s status as an arrestee and pretrial detainee, as opposed to a convict, makes a difference that precludes the Government from sampling and analyzing his DNA. It does. The factors on both sides of the totality-of-thecircumstanees equation are different for arrestees and pretrial detainees than for convicted felons: arrestees’ and pretrial detainees’ expectation of privacy in their DNA is greater, and the Government’s interests in accessing and analyzing that DNA are much less compelling.[5]
Convicts (whether prisoners or, as in Sczubelek, probationers) differ from arrestees and pretrial detainees in an obvious, but nonetheless critical, respect: they have been found guilty beyond a reasonable doubt, not just accused, of a crime. The conviction carries with it a permanent change in the person’s status from ordinary citizen to “lawfully adjudicated criminal ] ... whose proven conduct substantially heightens the government’s interest in monitoring” him and “quite properly carries lasting consequences.” United States v. Kincade, 379 F.3d 813, 836 (9th Cir.2004) (en banc) (plurality op.). Thus, it comes as no surprise that our analysis in Sczubelek turned on the defendant’s conviction, not his mere arrest, on federal felony charges. See 402 F.3d at 184-85 (“After his conviction of a felony, [defendant’s] identity became a matter of compelling interest to the government....”) (emphasis added); see also Maj. Op. 408-10 (noting that our analysis in Sczubelek “relied heavily on Sczubelek’s status as a convicted felon on supervised release”). Because they have not been adjudged guilty of any crime or suffered any corresponding permanent change in their status, arrestees and pretrial detainees necessarily retain a greater expectation of privacy than convicts do.
At the same time, and as the majority concedes, several of the interests that tipped the balance in the Government’s favor in Sczubelek do not carry the same force in this case. For example, “the in *422 terests in supervising convicted individuals on release and deterring recidivism,” which we considered important in Sczubelek, 402 F.3d at 186, “do not apply to arrestees or pretrial detainees,” Maj. Op. 402. The Government’s interests in this case are limited by the fact that, unlike convicts, arrestees and pretrial detainees are entitled to a presumption of innocence. Thus, unlike in Sczubelek, the Government may not assume that the subjects of the DNA collection are more likely to commit future crimes to justify the collection and analysis of their DNA. See United States v. Scott, 450 F.3d 863, 874 (9th Cir.2006) (“That an individual is charged with a crime cannot, as a constitutional matter, give rise to any inference that he is more likely than any other citizen to commit a crime if he is released from custody.”), quoted in Maj. Op. 415 n. 25.
B.
Accordingly, Sczubelek does not control. Instead, our analysis must begin at the starting point for all Fourth Amendment inquiries: an assessment of the privacy interests at stake. See United States v. Knights, 534 U.S. 112, 118-19, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (quoting Wyoming v. Houghton, 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)).
Arrestees and pretrial detainees do not forfeit their Fourth Amendment privacy protections simply by virtue of being arrested. Courts have sanctioned government intrusion into those rights in only a few, narrow circumstances, such as searches of a suspect’s person and the area within his immediate control incident to his arrest, see, e.g., Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), and prison searches for the purpose of “maintaining institutional security and preserving internal order and discipline,” Bell v. Wolfish, 441 U.S. 520, 546-47, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Neither circumstance exists in this case, and the majority does not suggest otherwise. Instead, the majority premises its entire analysis on the theory that arrestees and pretrial detainees have a purported “diminished expectation of privacy in their identities.” Maj. Op. 390. But this minimizes, and misses, the point, in three ways: (1) there is much more at stake in this case than arrestees’ and pretrial detainees’ expectation of privacy in their “identities”; (2) a person’s DNA is not equivalent to his fingerprints; and (3) no persuasive authority supports the notion that arrestees and pretrial detainees enjoy less than a full expectation of privacy in their DNA.
Before assessing the privacy interest at issue here, it is important to clarify the nature of the intrusion that takes place when a DNA sample is taken from an arrestee or pretrial detainee. First, his cheek is swabbed. This is the initial search. The swab is followed by a taking — a seizure — of a sample of fluid containing DNA fluid. The seizure is then followed by another search of the DNA and the creation from the retrieved sample of a profile. And so, an arrestee or pretrial detainee undergoes three separate intrusions: the search of his mouth, followed by a seizure of fluid, which is then searched in order to extract the desired end product, the DNA profile.
1. This Case Does Not Merely Concern Arrestees’ and Pretrial Detainees’ “Identities.”
It is inaccurate to say that the only (or, indeed, even the primary) privacy concern at stake in this case is arrestees’ and pretrial detainees’ “identities.” The real purpose of collecting arrestees’ and pretrial detainees’ DNA samples and including the resulting DNA profiles in the federal CO-DIS database is not to “identify ” the arrestee in the sense of allowing law enforcement to confirm that the correct person has been arrested or keeping records of *423 who has been in federal custody, but to use those profiles and the information they provide as evidence in the prosecution and to solve additional past and future crimes. See Gov’t Br. 42-43 (“Collection of DNA fingerprints at the time of arrest or at another early stage in the criminal justice process can solve, prevent, and deter subsequent criminal conduct....”); see also Maj. Op. 398-99 (noting that CODIS “ ‘allows State and local forensics laboratories to exchange and compare DNA profiles electronically in an attempt to link evidence from crime scenes for which there are no suspects to DNA samples ... on file in the system’ ” (quoting H.R. Rep. 106-900(1), at 8 (2000), reprinted in 2000 U.S.C.C.A.N. 2323, 2324)); Maj. Op. 414-15 (“Collecting DNA samples from arrestees can speed both the investigation of the crime of arrest and the solution of any past crime for which there is a match in CODIS.”). Indeed, to my mind, “[t]he collection of a DNA sample ... does not ‘identify’ an [arrestee or pretrial detainee] any more than a search of his home does— it merely collects more and more information about that [arrestee or pretrial detainee] that can be used to investigate unsolved past or future crimes.” Kineade, 379 F.3d at 857 n. 16 (Reinhardt, J., dissenting).[6]
The structure of the statute and accompanying regulatory scheme confirm that the statute’s animating purpose is not to identify the defendant. The statute provides for expungement of an arrestee’s or pretrial detainee’s DNA profile if the charges do not result in a conviction or if the Government fails to file charges within the applicable period. 42 U.S.C. § 14132(d)(l)(A)(ii). If the Government’s real interest were in maintaining records of arrestees’ identities, there would be no need to expunge those records upon an acquittal or failure to file charges against the arrestee. Indeed, this statutory provision serves as an admission that the fact of conviction, not of mere arrest, justifies a finding that an individual has a diminished expectation of privacy in his DNA.
Other features of the regulatory scheme further undermine the majority’s conclusion that the relevant privacy concern here is arrestees’ and pretrial detainees’ expectation of privacy in their “identities.” The statute and regulations contemplate collection of a DNA sample and analysis of that sample to create a “DNA profile,” which is then entered into CODIS.[7] The Government retains the full DNA sample indefinitely.[8] The arrestee’s or pretrial *424 detainee’s intact, unanalyzed DNA sample contains a “ ‘vast amount of sensitive information,’ ” Maj. Op. 407 (quoting United States v. Amerson, 483 F.3d 73, 85 (2d Cir.2007)), beyond the individual’s identity, including “familial lineage and predisposition to over four thousand types of genetic conditions and diseases” and, potentially, “genetic markers for traits including aggression, sexual orientation, substance addiction, and criminal tendencies,” United States v. Mitchell, 681 F.Supp.2d 597, 608 (W.D.Pa.2009) (citation omitted). The majority suggests that the “possible misuse and future use of DNA samples” is a matter of conjecture, Maj. Op. 408, but that seeks to divert from the issue at hand. Misuse and future use notwithstanding, the Government has taken, searched, and retained rich, privacy-laden DNA in the sample. The majority’s focus on the Government’s use of that DNA as the controlling privacy consideration is simply misguided. It is akin to saying that if the Government seizes personal medical information about you but can only use the subset of that information that serves to identify you, your privacy interest in the information taken is confined to a mere interest in your identity. Nothing could be further from the truth, and the majority engages in sleight of hand by suggesting otherwise.
The majority does not even attempt to support its thesis that arrestees and pretrial detainees have a diminished expectation of privacy in this extremely private and sensitive information. Instead, it avoids this issue by theorizing that statutory safeguards concerning the post-collection use of the samples validate, or justify, their earlier warrantless collection. Maj. Op. 407-08. But where in our jurisprudence have we held that post-collection safeguards on the use of seized material can immunize an otherwise impermissible search ? It bears repeating that a seizure and two invasive searches have already taken place before any question of the DNA sample’s use even comes into play. The majority’s emphasis on use to define— in fact, to cabin — the nature of the interest is not supportable in law or logic.
With these concerns in mind, it is little comfort that only so-called “junk DNA” is used to compile a suspect’s DNA profile. As our colleagues from the Ninth Circuit Court of Appeals have pointed out, “with advances in technology, junk DNA may reveal far more extensive genetic information.” United States v. Kriesel, 508 F.3d 941, 947 (9th Cir.2007). Indeed, studies already “have begun to question the notion that junk DNA does not contain useful genetic programming material,” Kincade, 379 F.3d at 818 n. 6 (plurality op.) (citation omitted); see also id. at 849-50 (Reinhardt., J., dissenting) (citing additional studies). Contrary to the majority, which dismisses these concerns as “hypothetical possibilities ... unsupported by the record before us,” Maj. Op. 408, we believe we should not be blind to the potential for abuse when assessing the legitimacy of government action. These concerns are legitimate and real, and should be taken into account in considering the totality of the circumstances in this case.
2. DNA Is Not the Same as Fingerprints or Photographs.
Taking an arrestee’s picture or fingerprints does not provide a useful analogy for analyzing the question of whether the Government may collect and analyze his DNA. See Maj. Op. 409-12. To the contrary, “[t]he seizure and indefinite storage of the [DNA] sample, which is what ... the government must justify under a *425 Fourth Amendment exception, is very different from fingerprinting and other traditional booking procedures.” See United States v. Pool, 621 F.3d 1213, 1238 (9th Cir.2010) (Schroeder, J., dissenting).
For one thing, collecting and analyzing DNA is much more intrusive than either fingerprinting or photographing. As noted above, the DNA samples the Government seeks to extract contain far more than the mere identifying information that can be gleaned from a suspect’s fingerprints or mug shot. And whereas the science surrounding DNA is still evolving (and may even be said to be in its early stages), we know that the potential to use fingerprints and mug shots for purposes other than identification is limited. Moreover, and quite obviously, the collection of a person’s DNA “ ‘requires production of evidence below the body surface which is not subject to public view,’ ” whereas fingerprinting and photographing do not. Sczubelek, 402 F.3d at 197-98 (McKee, J., dissenting) (quoting In re Mills, 686 F.2d 135, 139 (3d Cir.1982) (emphasis added)). While the Supreme Court, and we, have held in some circumstances that blood tests or other bodily intrusions constitute a “minimal” invasion of an individual’s privacy interests, see Maj. Op. 403-04 & cases cited therein, we should not dismiss any such intrusion lightly, cf. Schmerber v. California, 384 U.S. 757, 770, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (“The importance of informed, detached and deliberate determinations of the issue of whether or not to invade another’s body in search of evidence of guilt is indisputable and great.”); Sczubelek, 402 F.3d at 184 (noting that even the “slight intrusion” of a blood test is “unconstitutional” when required of “an ordinary citizen”).
At the same time, the Government’s interest in collecting fingerprints and photographs is stronger than its interest in collecting and analyzing DNA. In the case of photographs and fingerprints, the Government’s primary interest is to “identify” suspects in the traditional sense, i.e., to “ensure[] that the person who has been arrested is in fact the person law enforcement agents believe they have in custody.” United States v. Olivares-Rangel, 458 F.3d 1104, 1113 (10th Cir.2006). But with respect to DNA, the Government’s primary objective is to solve crimes. I agree with the majority that the Government’s interest in identifying individuals who have been arrested can be strong; where we part company is in the majority’s conclusion that it justifies the warrantless collection and analysis of DNA, which contains much more than just identifying information.
3. No Persuasive Authority Supports the Conclusion that Arrestees and Pretrial Detainees Have a Diminished Expectation of Privacy in Their DNA.
Even if arrestees’ and pretrial detainees’ expectation of privacy in their identities were the relevant privacy interest in this case, the caselaw concerning arrestees’ and pretrial detainees’ reduced expectation of privacy in their identities is not nearly as broad or clear-cut as the majority suggests.
The majority relies heavily on cases that approve the use of fingerprinting arrestees and pretrial detainees as part of routine “booking procedures.” See Maj. Op. 410-12. Fingerprinting does not provide a useful analogue in this ease for the reasons outlined above. Even leaving that aside, however, I disagree that the “booking procedures” cases carry the weight the majority assigns to them. As the majority concedes, most modern cases on the subject “assume the propriety of such booking procedures with little analysis.” Maj. Op. 410 n. 20; see, e.g., Smith v. United States, 324 F.2d 879, 882 (D.C.Cir.1963) *426 (“[I]t is elementary that a person in lawful custody may be required to submit to photographing ... and fingerprinting ... as part of routine identification processes.” (citations omitted)). That is particularly true of cases that proclaim that the Government has an interest in using those fingerprints for solving past and future crimes unrelated to the suspect’s arrest— they tend simply to state that “we accept” those practices as a truism, without any further citation or analysis. See, e.g., Jones v. Murray, 962 F.2d 302, 306 (4th Cir.1992) (stating, without citation to authority, “[w]e accept” routine fingerprinting “because the identification of suspects is relevant not only to solving the crime for which the suspect is arrested, but also for maintaining a permanent record to solve other past and future crimes”).
Where courts analyze the reasons we allow routine fingerprinting in any detail, they typically rely on one of two justifications: (a) that the evidence may be used to solve the particular crime for which the government has probable cause to arrest the suspect or (b) that the Government has a general interest in what the majority describes as the first “component” of a person’s identity' — •“ ‘who that person is.’ ”[9] Maj. Op. 414-15 (quoting Haskell v. Brown, 677 F.Supp.2d 1187, 1199 (N.D.Cal.2009)). Both justifications make sense and may be true in a limited context, but neither one explains why the Government may collect identifying information expressly for the purpose of. using it against arrestees in connection with other, unsolved crimes for which the Government has no basis to suspect the arrestee.
The majority seems to take additional comfort in the Ninth Circuit Court of Appeals’ recent holding in United States v. Pool, 621 F.3d 1213 (9th Cir.2010),[10] that a judicial or grand jury determination of probable cause that an individual has committed a crime provides a “legitimate reason” for finding that pretrial releasees have a diminished expectation of privacy in their DNA. Maj. Op. 401-03; see also Pool, 621 F.3d at 1220 (“[I]t is doubtful that Pool, or any other individual having been indicted by a grand jury or having been subjected to a judicial determination of probable cause, has any right to withhold his or her true identification from the government.”).
I do not find the reasoning of Pool to be applicable here. As an initial matter, Pool “condones DNA testing for individuals for whom a judicial or grand jury probable cause determination has been made; it does not address such sampling from mere arrestees.” Id. at 1231 (Lucero, J., concurring). The majority glosses over that *427 distinction, announcing the much broader holding that the probable-cause requirement “inherent in the statute,” which presumably incorporates an arresting officer’s finding of probable cause in addition to findings by a judge or grand jury, is enough to support a diminution in an arrestee’s or pretrial detainee’s expectation of privacy in his DNA. See Maj. Op. 412 n. 22. The majority never explains why that is the case.
Moreover, Pool, like most fingerprinting cases, never explains why a finding of probable cause in connection with a particular crime justifies the collection of DNA profiles for use in connection with other crimes for which, by definition, there has been no finding of probable cause or, indeed, any suspicion at all. I am not persuaded by the concurring opinion’s reasoning that a prior “probable cause determination limits the opportunities for mischief inherent in a suspicion-less search regime.” Pool, 621 F.3d at 1231-32 (Lucero, J., concurring). We do not view a finding of probable cause for one crime as sufficient justification to engage in warrantless searches of arrestees’ or pretrial detainees’ homes for evidence of other crimes, see, e.g., Chimel, 395 U.S. at 763, 89 S.Ct. 2034 (holding that, absent a search warrant, there is “no ... justification” for searching an area not within a suspect’s immediate control during an arrest), or even for purposes of identification, see, e.g., Hayes, 470 U.S. at 817, 105 S.Ct. 1643 (“[Njeither reasonable suspicion nor probable cause would suffice to permit ... officers to make a warrantless entry into a person’s house for the purpose of obtaining fingerprint identification”). Indeed, even after conviction, warrantless searches raise serious Fourth Amendment questions. Where the Supreme Court has upheld such searches, it has focused on non-law enforcement “special needs,” as in Griffin v. Wisconsin, 483 U.S. 868, 873-74, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), or “reasonable suspicion” that the subject of the search “is engaged in criminal activity,” as in United States v. Knights, 534 U.S. 112, 121, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). Neither circumstance exists in this case.
In light of the foregoing, I do not find any authority to support a general diminution of arrestees’ or pretrial detainees’ privacy interests by virtue of a finding of probable cause. Absent such authority, there is no basis for concluding that arrestees’ or pretrial detainees’ expectation of privacy in their DNA is diminished in any way.
C.
Acknowledging that the Government’s interests in “supervising convicted individuals on release and deterring recidivism do not apply to arrestees or pretrial detainees,” the majority rests its approval of the DNA collection scheme at issue here entirely on the Government’s interest in “collecting identifying information to aid law enforcement.” Maj. Op. 413. In so doing, the majority seems to have lost sight of the Fourth Amendment’s inherent strictures.
The Fourth Amendment provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.
U.S. Const, amend. IV. “Ordinarily, the reasonableness of a search depends on governmental compliance with the Warrant Clause, which requires authorities to demonstrate probable cause to a neutral magistrate and thereby convince him to provide formal authorization to proceed with a search by issuance of a particular *428 ized warrant.” Kincade, 379 F.3d at 822 (plurality op.) (citation omitted).
Throughout the years, courts have approved exceptions to the warrant and probable-cause requirements in certain carefully defined circumstances, such as searches incident to arrest, see, e.g., Chimel, 395 U.S. at 763, 89 S.Ct. 2034, limited, protective searches based on “reasonable suspicion” of imminent danger, e.g., Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and generalized prison searches to further legitimate penological goals, e.g., Florence v. Burlington Cnty., 621 F.3d 296, 307 (3d Cir.2010) (holding certain jails’ strip-search procedures reasonable in light of the jails’ interests in maintaining security). See generally Kincade, 379 F.3d at 822-24 (surveying exceptions to warrant and probable-cause requirements). But, given the express warrant and probable-cause requirements in the Fourth Amendment’s text, we must take special care when approving warrantless, suspicionless searches to ensure that our analysis is well grounded in the facts and law and that it makes jurisprudential and common sense.
Our task in Fourth Amendment cases is not to determine whether some asserted government interest might theoretically provide a rational basis for the challenged search. The majority’s conclusion that the government interest here is somehow sufficient does just that, and thereby transforms the analysis into one that is more akin to First Amendment reasoning.[11] But there is no “rational basis” principle in our Fourth Amendment jurisprudence.
The Supreme Court historically has regarded generalized interests in “law enforcement” as a particularly suspect type of government interest for Fourth Amendment purposes, and has specifically held invalid other suspicionless search programs that are designed to “uncover evidence of ordinary criminal wrongdoing” by the targets of the search. City of Indianapolis v. Edmond, 531 U.S. 32, 42, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000); see also, e.g., Ferguson v. City of Charleston, 532 U.S. 67, 83, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) (invalidating hospital program, developed with police involvement, of drug testing pregnant women and turning over evidence of drug use to law enforcement for use in prosecutions because “the immediate objective of the searches was to generate evidence for law enforcement purposes ”) (emphasis in original); see generally Sczubelek, 402 F.3d at 190-97 (McKee, J., dissenting) (providing comprehensive overview of Supreme Court precedent in this area); Kincade, 379 F.3d at 854 (Reinhardt, J., dissenting) (“Never once in over two hundred years of history has the Supreme Court approved of a suspicionless search designed to produce ordinary evidence of criminal wrongdoing by the police.”); cf. Illinois v. Lidster, 540 U.S. 419, 423-24, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004) (holding that searches or seizures designed to elicit information about a particular crime “in all likelihood committed by others” are constitutional, unlike those designed to determine whether the particular individuals stopped are “committing a crime”).[12] This treatment *429 comports with basic notions of the role the Fourth Amendment plays in protecting the lives of ordinary citizens. See, e.g., Kincade, 379 F.3d at 851-52 (Reinhardt, J., dissenting) (“[The Framers] knew that the use of suspicionless blanket searches and seizures for investigatory purposes would ‘subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention.’ ”) (quoting Davis v. Mississippi, 394 U.S. 721, 726, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969)).
The majority ignores all of this context and accepts at face value the notion that the public interest in prosecuting crime is a “key interest” that, without more, justifies the Government’s collection and analysis of arrestees’ and pretrial detainees’ DNA. See Maj. Op. 413-15. However, in light of the Fourth Amendment’s text and the Supreme Court’s guidance in interpreting it, the Government’s interest in evidence-gathering and crime-solving deserves little or no weight in our Fourth Amendment review. Even were we to assume some diminution in arrestees’ and pretrial detainees’ expectation of privacy in their DNA, the Government cannot trump that expectation simply by invoking its interest in solving crimes.
Of course, the Government’s interest in solving past and future crimes is a legitimate and serious one. But if that were our only concern, we would authorize the collection and inclusion in CODIS of DNA profiles of every citizen — surely, that would “assist[] the Government in accurate criminal investigations and prosecutions.” Maj. Op. 414. Similarly, if we hold that this interest prevails over some inchoate “diminished expectation of privacy,” then we may be opening the door to the collection and analysis of DNA for crime-solving purposes from the “many other groups of people who,” under Supreme Court precedent, “have a reduced expectation of privacy,” including, e.g., “students who attend public schools and participate in extracurricular activities” and “drivers and passengers of vehicles.” Sczubelek, 402 F.3d at 198-99 (McKee, J., dissenting) (citations omitted); see also Kincade, 379 F.3d at 844 (Reinhardt, J., dissenting) (“Under the test the plurality employs, any person who experiences a reduction in his expectation of privacy would be susceptible to having his blood sample extracted and included in CO-DIS — attendees of public high schools or universities, persons seeking to obtain drivers’ licenses, applicants for federal employment, or persons requiring any form of federal identification, and those who desire to travel by airplane, just to name a few.”). Routine searches of arrestees’ homes would also be permitted as furthering the Government’s legitimate crime-solving interests.
The absurdity of these examples underscores that the Government’s crime- *430 solving interests, while compelling in the abstract, cannot carry the day here. Warrantless searches require so much more. I do not agree with the majority that arrestees’ and pretrial detainees’ expectation of privacy in their DNA yields so easily to the Government’s generalized evidence-collection and crime-solving concerns.
D.
It should also be noted that the Court has before it a facial challenge to § 14135(a)(1)(A) and its implementing regulation, 28 C.F.R. § 28.12, not an as-applied challenge. The statute and the regulation are unconstitutional on their face, satisfying even the most stringent standard for a facial challenge. This standard, announced in United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), requires that the party asserting the challenge “must establish that no set of circumstances exists under which the Act would be valid.”[13] The test is met here. No set of circumstances exists under which a statute and regulation mandating DNA collection for all arrestees and pre-trial detainees can be constitutionally valid.
The majority approaches the apparent ambiguity in the nature of Mitchell’s challenge by, it says, considering both an as-applied and a facial challenge to the statute. However, what it refers to as its analysis of Mitchell’s “as-applied” challenge is, in fact, an analysis of whether the statute is constitutional on its face. In balancing Mitchell’s and the Government’s interests, the majority speaks in sweeping and general terms.[14] Aside from a few semantic nods, nothing in its “as applied” analysis looks at the DNA Act as applied to Mitchell in particular. Instead, it evaluates the general question of whether it is constitutional to collect DNA from federal arrestees and pretrial detainees. See United States v. Marcavage, 609 F.3d 264, 273 (3d Cir.2010) (“An as-applied attack ... does not contend that law is unconsti *431 tutional as written but that its application to a particular person under particular circumstances deprives that person of a constitutional right.”)- The majority concludes from this analysis that 42 U.S.C. § 14135(a) is constitutional as applied to Mitchell and, therefore, as this represents a circumstance in which the statute can be applied constitutionally, that Mitchell cannot meet the “no set of circumstances” test for a facial challenge. Maj. Op. 415-16. The majority’s mislabeling of its facial analysis as an as-applied analysis is, thus, inconsequential in the end, but nonetheless perplexing. As an effort to confine its far-reaching holding, it fails.
Regardless of how Mitchell’s challenge to 42 U.S.C. § 14135(a) was formulated, the statute and its implementing regulation are facially unconstitutional. They require warrantless, suspicionless collection of DNA from the bodies of all arrestees and pre-trial detainees. There is no set of circumstances under which this requirement, i.e., that all arrestees are to be swabbed, can be said to be constitutional. Its blanket mandate contradicts basic and essential Fourth Amendment principles.
Accordingly, I respectfully dissent, as I would affirm the District Court’s order.

. Although the majority relies heavily on cases involving post-judgment appeals, such as United States v. Peterson, 394 F.3d 98 (2d Cir.2005), these cases are inapposite, as they present no risk that the Government's appeal will disrupt district court proceedings. Cf. United States v. Moussaoui, 483 F.3d 220, 231 (4th Cir.2007) ("Moussaoui II ”) (exercising collateral-order jurisdiction over an appeal of a post-judgment order because "accepting jurisdiction over the appeal in no way prolongs the Government’s prosecution of Moussaoui, who has already been sentenced”).

. The majority also cites United States v. Santtini, 963 F.2d 585 (3d Cir.1992), as a case in which we held that "interests asserted by the Government ... are sufficiently important to merit interlocutory review.” Maj. Op. 395. But in Santtini, we specifically "refrain[ed] from hearing the government’s appeal under section 1291” because we found that the order underlying the Government's appeal did not satisfy all of the collateral-order doctrine’s requirements. 963 F.2d at 592.

. Similarly, an order allowing the Government to collect a defendant's DNA by force under 42 U.S.C. § 14135a(a)(4)(A) would raise constitutional concerns that would warrant interlocutory review of an appeal by the defendant. But that is not the order before us in this case.

. In addition, at oral argument the Government was asked whether the DNA collected before trial would be used to aid judges in determining whether to release pre-trial detainees on bail. The Government replied in the affirmative. Indeed, one of the compelling interests identified by the Government is its interest in determining whether a person accused of a crime may have been involved in past criminal activity and, thus, may presently pose a danger to the community. If the arrestee's DNA profile were to reveal such a history, a judge would want to factor this into his bail decision, creating another link to the merits of a defendant’s prosecution. See United States v. Abuhamra, 389 F.3d 309, 323 (2d Cir.2004) ("Bail hearings fit comfortably within the sphere of adversarial proceedings closely related to trial.... [Bjail hearings, like probable cause and suppression hearings, are frequently hotly contested and require a careful consideration of a host of facts about the defendant and the crimes charged.”).

. I agree with the majority that, following Sczubelek, we must apply the “totality of the circumstances” test to determine the Fourth Amendment "reasonableness” of the contested search at issue in this case. Maj. Op. 402-03. But I share Judge McKee's concern that, when applied in these circumstances, such an analysis mimics a "special needs” analysis "while ignoring that the 'need' relied upon is law enforcement.” See Sczubelek, 402 F.3d at 199-201 (McKee, J., dissenting).

. In Sczubelek, we used the concepts of "identity” and "identifying information” interchangeably. See 402 F.3d at 184-85 (reasoning that, because convicted offenders cannot assert a privacy interest in photographs and fingerprints as "means of identification” they also must forfeit their interests in the “identifying information” provided by their DNA). But I submit that there is an important distinction between these two concepts. It is the identifying information about the defendant, not his identity as such, that interests the Government in his DNA. Only through the use of that identifying information will additional crimes be solved.

. Although the majority considers the collection of the DNA sample and its subsequent analysis to create the DNA profile together, the majority and the Government acknowledge that both are constitutionally significant searches subject to Fourth Amendment scrutiny. Gov't Br. 21-22; Maj. Op. 404; see also Sczubelek, 402 F.3d at 182 (quoting Skinner v. Ry. Labor Executives’ Ass'n, 489 U.S. 602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)). As discussed above, three separate instances of search or seizure occur throughout the DNA collection and analysis process authorized by 42 U.S.C. § 14135(a)(1)(A).

.The statute provides for the expungement of DNA profiles from CODIS under certain circumstances, see 42 U.S.C. § 14132(d)(1), but does not provide any mechanism for the disposal of the DNA samples. The Government states that, "if the conditions for expungement of a DNA profile under § 14132(d)(1) *424 are satisfied, the FBI disposes of the DNA sample from which it was derived as well,” Gov’t Reply Br. 22, but does not cite any authority to support that assertion.

. The Supreme Court employed the former justification in Hayes v. Florida, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) (cited in Maj. Op. 411), when it expressed support "for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect’s connection with that crime, and if the procedure is carried out with dispatch,” id. at 817, 105 S.Ct. 1643 (citation omitted) (emphasis added). United States v. Olivares-Rangel, 458 F.3d 1104 (10th Cir.2006), provides a good example of the latter justification. In that case, the court explained, "[fjingerprinting ensures that the person who has been arrested is in fact the person law enforcement agents believe they have in custody," and "[t]he government always has the right, and indeed the obligation, to know who it is that they hold in custody regardless of whether the arrest is later determined to be illegal,” Id. at 1113 (emphases added).

. As the majority noted, the Ninth Circuit voted on June 2, 2011 to rehear Pool en banc. In granting rehearing, the Ninth Circuit ordered that the three-judge panel opinion shall not "be cited as binding precedent by or to any court of the Ninth Circuit.” United States v. Pool, 646 F.3d 659 (9th Cir.2011).

. In First Amendment cases, our task is first to determine whether the challenged government action infringes a fundamental right protected by the Amendment. If the statute does not do so, the federal or state government "need only demonstrate a rational basis to justify" it. Ysursa v. Pocatello Educ. Ass'n, 555 U.S. 353, 129 S.Ct. 1093, 1098, 172 L.Ed.2d 770 (2009).

. The Second Circuit Court of Appeals held that Lidster supports its determination that a New York DNA collection statute does not violate the Fourth Amendment, classifying the DNA collection program as an "information- *429 seeking," rather than a "crime detection" search. Nicholas v. Goord, 430 F.3d 652, 668-69 (2d Cir.2005). Respectfully, I disagree. Unlike in Lidster, where the Court stressed that the search sought information from "members of the public for their help in providing information about a crime in all likelihood committed by others,” 540 U.S. at 423, 124 S.Ct. 885, the scheme at issue in this case searches arrestees for the very purpose of determining whether they — not “others”— are "possibly implicated in other crimes,” Maj. Op. 414. The vast program of DNA profiling at issue in this case cannot be characterized as simply "information-seeking,” and neither the Government nor the majority even attempts to justify it on that ground. Instead, like the program the Supreme Court declared unconstitutional in Edmond, the Government's DNA collection and analysis program here is justified "only by the generalized and ever-present possibility that” including the seized DNA in CODIS "may reveal that any given [arrestee or pretrial detainee] has committed some crime.” 531 U.S. at 44, 121 S.Ct. 447.

. In reciting this test for a facial challenge, the majority fails to mention the uncertainty of its continuing vitality. In City of Chicago v. Morales, 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999), a plurality of the Court explained that, "[t]o the extent we have consistently articulated a clear standard for facial challenges, it is not the Salerno formulation, which has never been the decisive factor in any decision in this Court, including Salerno itself.” See also Washington v. Glucksberg, 521 U.S. 702, 740, 117 S.Ct. 2258, 138 L.Ed.2d 111 (1997) (Stevens, J„ concurring) ("I do not believe the Court has ever actually applied such a strict standard [as no set-of-circumstances], even in Salerno itself, and the Court does not appear to apply Salerno here.”). Most recently, the Court has analyzed facial challenges under both the Salerno standard and the less rigorous rule "that a facial challenge must fail where the statute has a plainly legitimate sweep.” Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (quotation marks and citations omitted) (noting that "some Members of the Court have criticized the Salerno formulation” and holding that Washington state law governing primary elections "survives under either standard.”). Mitchell’s challenge meets the Court's most exacting standard, but it is unclear whether that is even required for him to prevail.

. For example, it describes the intrusions at issue as "the act of collecting DNA” and "the processing of the DNA sample and creation of the DNA profile for CODIS,” not as collecting a particular person's DNA under particular circumstances. Maj. Op. 407. It finds that Mitchell's privacy argument is unavailing "in light of the restrictions built into the DNA profiling process,” suggesting that the process writ large — not the particular process that Mitchell underwent — is constitutionally sound. Similarly, it explains the Government’s interests in general terms. The Government’s alleged interest in identifying arrestees, the majority says, justifies the statute itself, not the statute as it is applied to Mitchell. Maj. Op. 413-15.